Sandra COSTA

v.

**REGISTRAR OF MOTOR VEHICLES.**

No. 87–73–M.P.

Supreme Court of Rhode Island.

July 8, 1988.

George L. Santopietro, Mark Thomas Buben, Coia & Lepore, Ltd., Providence, for plaintiff.

Joseph M. Rameka, Special Counsel, Dept. of Transp., for defendant.

OPINION

KELLEHER, Justice.

This is an appeal by the State Registrar of Motor Vehicles from an order of a District Court justice to return a chauffeur's license to Sandra Costa (Costa), who, prior to the registrar's suspension, had been employed as a schoolbus driver. The registrar's appeal has been taken pursuant to the pertinent provisions of G.L. 1956 (1984 Reenactment) chapter 35 of title 42.

Costa's schoolbus permit and chauffeur's license were suspended following a high-speed chase involving Costa and the Cranston police on the evening of February 9, 1986. Costa was charged with "eluding a police officer." This charge was subsequently dismissed by a District Court justice in early April 1986. However, information contained in the police report caused the registry to be concerned about Costa's suitability as a schoolbus driver. The report contained information that approximately one month before the chase episode, Costa had suffered a "seizure" and "blacked out" while working as a schoolbus driver.

As a result of this information, her license was suspended on March 14, 1986. She requested a hearing for the purposes of rescinding or "staying" the suspension pending a decision by the registry's medical

advisory board.[1] Subsequently, in late April 1986, Costa was notified that the registry's medical advisory board had reviewed her medical records and recommended that Costa's chauffeur's license be suspended.

Costa invoked the provisions of § 42–35–15, as amended by P.L. 1984, ch. 183, § 2, and appealed the suspension order to the District Court alleging that the registrar's decision was not only clearly erroneous "in view of the reliable, probative and substantial evidence on the whole record" and but also "otherwise arbitrary or capricious."

After oral arguments were presented on Costa's behalf, the District Court justice remanded the case to the registrar for the purposes of clarifying the grounds on which the medical advisory board relied when it recommended the suspension.

The information sought was forwarded to the District Court justice in early December 1986. Oral argument was again scheduled, and at its conclusion the District Court justice indicated that he would publish a written decision. In early February 1987 the trial justice, in a written decision, vacated the registry's suspension order and directed the registrar to reinstate Costa's chauffeur's license.

It should be noted that the registry issues two types of licenses—one is an operator's license that permits its possessor to operate a private passenger motor vehicle [2] and the other is a chauffeur's license that is issued to operators of motor vehicles other than private passenger automobiles or motorcycles. There are three categories of chauffeur's licenses. A class 1 license is granted for the operation of a jitney, bus, schoolbus, or public livery; a class 2 license is required by anyone seeking to operate a truck having a carrying capacity in excess of five tons; a class 3 license enables its possessor to operate vehicles having a capacity of five tons or more as well as tractor trailers.

The record considered by the trial justice consisted of the police report of the February 1986 chase, a summary of what took place before the medical advisory board, a report submitted by the physician who had examined Costa at the request of her employer, as well as a report by a neurologist, which had apparently been given at the request of Costa's counsel. The police report, as noted earlier, contained information regarding Costa's having experienced a "seizure" and the fact that she "blacked out" while driving a schoolbus.

An interoffice memo prepared by the registry's chief of operator control served as the source of what happened before the medical advisory board. The memo reports the board's concern that children on a bus could create a stressful situation for Costa that would adversely affect her behavior. Reference is also made to the board's longstanding policy of adhering to a higher degree of responsibility on the part of one who holds a chauffeur's license.

In his report the physician who had examined Costa at the request of her employer referred to an examination conducted by a neurologist and expressed the belief that "there really is no more reason why [Costa] should not be allowed to continue in her present employment as a schoolbus driver." The neurologist's report consists of a letter in which the physician responds to each of twelve questions asked of him by Costa's counsel. His relevant responses indicate that even though Costa might have had seizures in the past, the January 1986

---

1. The medical advisory board was established pursuant to G.L. 1956 (1982 Reenactment) § 31–10–44, as amended by P.L. 1984, ch. 225, § 1, which provides that the medical advisory board will function as a reviewing and advisory panel to the Registrar of Motor Vehicles when the fitness of a licensee is in question. The board consists of eight individuals, two members are representative of the general public—one of whom shall be representative of the elderly, and one of whom shall be representa-

tive of the handicapped or disabled. The membership also consists of a physician in general practice, a neurologist, a psychiatrist, an optometrist, an orthopedic physician, and a physician from the Rhode Island Department of Health.

2. It should be noted that throughout this controversy Costa has retained her operator's license. The registrar's sole concern was the status of Costa's chauffeur's license.

episode was the result of an anxiety attack rather than a seizure. He thought the prognosis was good and that the patient "could operate a motor vehicle."

The trial justice faulted the actions of the medical advisory board for its failure either to interview or to examine Costa. In finding that the record before the registrar failed to contain sufficient evidence that would support a suspension, the trial justice pointed out that although the two doctors' reports before the registrar mentioned a "blackout" and an irregular EEG pattern, each physician was of the belief that notwithstanding these factors, Costa was physically able and mentally competent to operate a motor vehicle. The trial justice also stressed the fact that one of the doctors specifically found Costa capable of resuming her employment as a schoolbus driver. He also emphasized the lack of any suggestion of a continuing or potentially recurring adverse-behavior problem in light of the allegations contained in the Cranston police report.

Subsequently, in February 1987, a judgment was entered in the District Court overruling the suspension and directing Costa's chauffeur's license to be reinstated.

■ The scope of judicial review of administrative-agency decisions is limited by § 42–35–15(g). A court must not substitute its judgment for that of the agency in regard to the credibility of the witnesses or the weight of the evidence concerning questions of fact. However, an administrative decision can be vacated if it is clearly erroneous in view of the reliable, probative, and substantial evidence contained in the whole record. *Newport Shipyard, Inc. v. Rhode Island Commission for Human Rights*, 484 A.2d 893 (R.I. 1984).

The issue before us is whether the District Court justice erred in ruling that the registrar's decision was not supported by sufficient evidence. The registrar, for his part, argues that there is ample evidence to support the medical advisory board's recommendation, emphasizing the police report notation that Costa, "while on duty as a bus driver, suffered a blackout." Costa, on the other hand, argues that there was no medical evidence to substantiate the decision to suspend. Rather, she suggests, the registrar's decision was "in direct contradiction to the medical evidence."

Our statutory scheme governing the issuance of licenses to operate a motor vehicle makes very few distinctions relative to the issuance of an operator's license or a chauffeur's license. One distinction is that G.L. 1956 (1982 Reenactment) § 31–10–3, as amended by P.L. 1984, ch. 196, § 2, states that an individual must be eighteen years old to obtain a chauffeur's license, whereas a sixteen-year-old can obtain an operator's license. Section 31–10–5 states that a schoolbus driver must be twenty-one years old, and furthermore, schoolbus drivers are required to complete annual driver-training programs. *See* § 31–10–5 and § 31–10–5.1, as enacted by P.L. 1986, ch. 413, § 2.

Beyond questions of age and training there is virtually no other difference as to the conditions which must be satisfied before either license can be issued or suspended. The reasons for which the registry is authorized to suspend licenses apply equally to operator's or chauffeur's licenses. Section 31–11–7(a), as amended by P.L. 1984, ch. 196, § 3. It appears that Costa's license was suspended pursuant to § 31–11–7(a)(5), which states that the registry is authorized to suspend the license of an operator or chauffeur "upon a showing by its records or other sufficient evidence that the licensee: * * * [i]s incompetent by reason of physical or mental disability to drive a motor vehicle with safety upon the highways." [3]

Notwithstanding the trial justice's remand for additional hearings and findings,

---

3. Subsequent to Costa's license suspension, § 31–10–44 was amended by P.L. 1986, ch. 502, § 1, to provide that if the board denies an application "or suspends a license on grounds of physical or mental fitness * * * it shall: (1) give in writing specific reasons for denial or suspension; (2) communicate the decision within ten (10) days to the operator; (3) provide that at no time shall the burden of proof be placed upon the operator as to the [operator's] physical or mental fitness and evidence of such unfitness shall [be] by clear and convincing evidence."

the record is somewhat sparse. For example, there is a single statement by the neurologist that tests showed "EEG abnormal characterized by mild diffuse slowing." Yet there is no explanation of the medical significance of that statement. The medical advisory board obviously relied on this statement when recommending the suspension of Costa's license. However, the neurologist who performed and interpreted that test believed that Costa had not had a seizure, and he placed no restrictions on her activities. He also specifically indicated that she could operate a motor vehicle. There is a suggestion that she had had a seizure six years before but there is no record about the extent, type, severity, frequency, or cause of any past seizure activity.

The validity of license suspensions or denials based on physical or mental disability has proved to be a fertile source of litigation. Although it has been said that there are few common elements in these disputes, the following broad principles should be noted: "[I]n order to support the administrative denial or withdrawal of driving privileges upon the statutory ground of physical disability, there must be competent, substantial evidence of the existence of some tangible disease or defect which bears, or could in the future bear, adversely upon the particular motorist's capacity to drive safely." Annot., *Denial, Suspension, or Cancellation of Driver's License Because of Physical Disease or Defect*, 38 A.L.R.3d 452, 457 (1971).

Courts have considered a number of factors that bear on an allegedly impaired driver's ability to drive safely. These include the operator's past driving record; his or her medical history, especially the frequency of recurrences of blackouts or seizures, and the controllability of such recurrent episodes through medication; the operator's ability to predict or anticipate an episode in which he or she might lose consciousness; his or her ability to compensate for a physical defect in other ways; and the hardship that denial or suspension would cause. *See generally* 38 A.L.R.3d §§ 3–8 at 458–62.

The Arizona Supreme Court held that the Division of Motor Vehicles had wrongfully denied a license to a person with a history of epileptic seizures. *Thomas v. Arizona Department of Transportation*, 144 Ariz. 579, 698 P.2d 1298 (1985). The Arizona officials had relied on the recommendation of its medical advisory board, which had informally adopted standards requiring epileptics to be seizure-free for one year before a license could be issued. The applicant admittedly had had a seizure within the year before he filed his license application. However, the Arizona Supreme Court did not consider the propriety of the one-year-seizure-free policy but held that the policy should have been adopted as a formal rule. Without such a formal rule, the court observed, the state agency would have been required to prove by expert medical evidence—which was lacking—that the plaintiff posed a danger to himself or others.

Rhode Island's medical review board functions, in the terms of the statute, as a reviewing and advisory panel to the registrar on the subject of physical standards for operators. Whenever a license application is questioned on the grounds of physical fitness, the board is required to assist the registrar in determining the licensee's qualifications to operate a motor vehicle. The board is also empowered to promulgate rules and regulations as it deems necessary for the determination of standards relative to the issuance or the denial of a license on the grounds of medical and/or mental fitness.

■ Since the advisory board is specifically authorized by § 31–10–44 to promulgate rules, the board is also bound by other provisions of the Administrative Procedures Act relative to an agency's rule-making power. Thus the board, like its Arizona counterpart, is also required to follow the filing procedures set forth in §§ 42–35–3 and 42–35–6 if it wishes its rules to be accorded judicial recognition. We believe that the advisory board's rule-making power affords a requisite legal basis for it to promulgate eligibility requirements for chauffeur's licenses that may be more

stringent than those for operator's licenses. We would emphasize that while we acknowledge Costa's concern for continued employment, our primary concern in this dispute is for the safety and welfare of the many passengers who, in this state, are transported to and from school by bus on each and every schoolday. We are especially concerned in this litigation about the opinion given by the neurologist. As noted earlier, at no time did this recognized expert endorse the general practitioner's opinion that Costa could return to her employment as a busdriver. It may be that when the neurologist used the term "motor vehicle," he included in its definition a schoolbus. However, we shall not indulge in speculation.

The critical issue in this dispute is whether Costa's return to work will pose a hazard to the safety of her passengers and/or the general public. In our opinion, the neurologist's use of the term "motor vehicle" requires clarification. Accordingly, the record in this case is remanded to the District Court where the neurologist may submit another affidavit and be subject to examination by counsel for each litigant. The trial justice will then either affirm his prior finding or sustain the registrar's appeal. Either party may seek review of the trial justice's actions by invoking the provisions of § 42–35–16.