[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
DECISION
Before the Court is an appeal by Edward D. DiPrete, former Governor of the State of Rhode Island (hereinafter "Plaintiff"), who seeks reversal of a December 20, 1991, decision by the Rhode Island Ethics Commission (hereinafter "the Commission") which determined that plaintiff had violated certain provisions of Chapter 14, Title 36 of the Rhode Island General Laws. Jurisdiction is pursuant to G.L. 1956 (1988 Reenactment) §42-35-15.
Statement of Facts
In November of 1984, plaintiff was elected Governor of the State of Rhode Island and sworn into office on or about January 11, 1985. Plaintiff was subsequently re-elected as Governor in the general elections held in 1986 and 1988. In total, plaintiff served three (3) complete terms.
On or about January 18, 1989, Common Cause of Rhode Island ("Common Cause"), an organization whose purpose is to create an open and accountable system of government, filed a complaint with the Commission alleging that plaintiff had violated certain provisions of the State's ethics laws. The complaint alleged that plaintiff had improperly utilized his position as Governor to obtain favorable results and/or State contracts for certain relatives, friends, or business associates.
Thereafter, pursuant to his statutory powers the Executive Director of the Commission referred the complaint to an investigative committee. Said committee was charged with making a preliminary investigation into the complaint in order to determine whether probable cause existed to support the charges. On or about March 3, 1989, after having conducted the preliminary investigation, the committee dismissed all allegations which had occurred prior to June 25, 1987.[1] The committee also dismissed several allegations of impropriety which it determined were not violative of the State's Code of Ethics. However, the committee did find that sufficient evidence existed to support those allegations which occurred on or after June 26, 1987.
The committee thereafter conducted a more thorough investigation of two (2) specific incidents. The first incident involved plaintiff's alleged participation or involvement in connection with the choice of legal counsel to represent the State in anticipated litigation relating to the construction of the new Jamestown Bridge. The second incident involved plaintiff's alleged participation or involvement with respect to the choice of an engineering firm for a water quality project to be implemented at Olney Pond in Lincoln Woods State Park. Relying upon a report prepared by the Commission's Executive Director's attorney-designee, John Roney, the investigating committee, on May 16, 1991, issued a notice of preliminary determination that the committee was satisfied that a violation of the Code of Ethics had occurred with respect to both incidents.
Pursuant to G.L. 1956 (1990 Reenactment) § 36-14-13 a full adjudicative panel consisting of six (6) members of the Commission began hearings pertaining to both the Jamestown Bridge and Olney Pond contracts. Said hearings commenced on October 17, 1991, and continued until December 17, 1991, when final arguments were heard. The Commission heard extensive testimony from various witnesses who allegedly had either direct or indirect involvement with the awarding of the Jamestown Bridge and Olney Pond contracts.
The panel thereafter issued a written decision on December 20, 1991, wherein seventy-six (76) findings of fact were made. Based upon these findings of fact, the panel unanimously concluded that plaintiff had violated sections 5(a), 5(d), 5(g), and 7(a) of Chapter 14, Title 36 of the General Laws with respect to the awarding of the Olney Pond contract. The panel also found that plaintiff had violated sections 5(a), 5(d), and 7(a) with respect to the selection of counsel for the Jamestown Bridge matter. Additionally, the panel concluded that plaintiff had violated § 6 of Chapter 14, Title 36 with respect to the awarding of both contracts. Pursuant to § 13(e)(3) of said chapter and title the Commission assessed a total of thirty thousand dollars ($30,000.00) in fines against plaintiff.
Plaintiff subsequently filed the instant appeal pursuant to §36-14-15 of the General Laws which provides that any action by the Commission is subject to judicial review in accordance with Chapter 35 of Title 42. Specifically, this Court's review is governed by § 15(g) which provides in pertinent part:
 42-35-15. Judicial review of contested cases.
 (g) The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
Our Supreme Court has on many occasions interpreted the meaning of said statute so that this Court's function in reviewing the instant appeal is well-defined. Although empowered to review the decisions of an administrative agency this Court is prohibited from substituting its judgment for that of the agency with respect to the credibility of the witnesses or the weight of the evidence concerning questions of fact. Costa v. Registry ofMotor Vehicles, 543 A.2d 1307 (R.I. 1988); Guarino v.Department of Social Welfare, 122 R.I. 583, 410 A.2d 425 (1980). The Court is constrained to uphold the agency's finding if it determines that the decision was supported by legal and competent evidence. Blue Cross Blue Shield v. Caldarone, 520 A.2d 969
(R.I. 1987); E.G. Grossman and Sons, Inc. v. Rocha,118 R.I. 276, 373 A.2d 496 (1977). This is so even where the Court is inclined to view the evidence differently than did the agency.Cahoone v. Board of Review, 104 R.I. 503, 246 A.2d 213 (1968).
Conversely, the Court may reverse the decision only if it determines that the factual findings upon which the decision was based are devoid of competent evidentiary support. Milardo v.Coastal Resources Management Council, 434 A.2d 266, 270 (R.I. 1981). The Court may vacate the decision if it is clearly erroneous in view of the reliable, probative, and substantial evidence contained in the whole record. Costa, supra.
The case at bar involves allegations of misconduct with respect to two (2) distinct incidents thereby necessitating the Court to consider each incident separately. The Court will discuss the relevant issues and arguments proffered by both plaintiff and the Commission in seriatum.
I.
The Jamestown Bridge Matter
The State of Rhode Island ("the State") in 1984 contracted with an amalgamation of firms known as the Clarke-Fitzpatrick Franki Foundation ("Clarke-Fitzpatrick") to construct a new Jamestown Bridge. Clarke-Fitzpatrick thereafter began construction of the much-needed replacement but immediately encountered myriad problems. In late 1986 disputes between the State and Clarke-Fitzpatrick arose concerning both the quality and method of construction. The Department of Transportation ("DOT"), which was charged with overseeing the construction of the new span, began to reconsider the original selection of Clarke-Fitzpatrick and actively began to consider terminating the contract. In any event, DOT anticipated that litigation with Clarke-Fitzpatrick was imminent and that costs could amount to somewhere in the neighborhood of forty (40) million dollars.
Concerned that in-house counsel was unable to handle such a large lawsuit, officials at DOT began, in or about the summer of 1987, deliberating upon whether or not to hire outside counsel.[2] Ms. Ridolfi had originally considered a nationwide search for acceptable firms which would be qualified to handle the lawsuit. However, she was advised by Gill to confine her search for outside counsel to local law firms.[3] Ms. Ridolfi, who admitted she was inexperienced at such a task, began to solicit names of local qualified firms.
This informal solicitation led to a list of six (6) local firms which seemingly had the qualifications to handle such a large lawsuit. On or about September 1, 1987, Ms. Ridolfi began contacting these firms inquiring as to their respective interest in representing the State. Thereafter, on or about September 3, 1987, Ms. Ridolfi generated a letter to each firm requesting that each respond on or before September 11 with a statement of qualifications.
On or about September 4, 1987, Ms. Ridolfi was instructed by Gill to add the law firm of Taft/McSally to the list of firms under consideration.[4] Ms. Ridolfi complied with Gill's request and on September 8, 1987, generated a letter to Taft/McSally asking that they respond prior to September 11. On said date, Ms. Ridolfi received three (3) proposals, one each from two (2) of the original six (6) firms, and a joint proposal from Taft/McSally and Carroll, Kelly Murphy. Ms. Ridolfi at some point gave the three (3) proposals to Gill.
The joint proposal by Taft/McSally and Carroll, Kelly 
Murphy (hereinafter collectively "Taft/McSally") was chosen by Gill on or about September 21, 1987. Gill thereafter instructed Ms. Ridolfi to prepare two (2) separate contracts for the hire of outside counsel to represent the State in the Jamestown-Verrazzano Bridge case.[5] The case has been extensively litigated and is presently pending a decision from Associate Justice Thomas Needham. As of December 20, 1991, a total of $723,407.79 had been billed to the State of which amount Taft/McSally has received $258,125.60, while Carroll, Kelly 
Murphy has received $465,282.19.
Premised upon the above occurrences, as well as the complaint filed by Common Cause, the Commission found that as a result of Taft/McSally being awarded the contract plaintiff had violated sections 5(a), 5(d), 6, and 7(a) of Chapter 14, Title 36 of the General Laws. Said sections provide, respectively, as follow:[6]
 36-14-5. Prohibited activities.
 (a) No person subject to this code of ethics shall have any interest, financial or otherwise, direct or indirect, or engage in any business, employment, transaction, or professional activity, or incur any obligation of any nature, which is in substantial conflict with the proper discharge of his or her duties or employment in the public interest and of his or her responsibilities as prescribed in the laws of this state, as defined in § 36-14-7.
 (d) No person subject to this code of ethics shall use in any way his or her public office or confidential information received through his or her holding any public office to obtain financial gain, other than that provided by law, for him or herself or spouse (if not estranged) or any dependent child or business associate or any business by which the person is employed or which the person represents.
 35-14-7. Interest in conflict with discharge of duties.
 a) A person subject to this code of ethics has an interest which is in substantial conflict with the proper discharge of his or her duties or employment in the public interest and of his or her responsibilities as prescribed in the laws of this state, if he or she has reason to believe or expect that he or she or his or her spouse (if not estranged) or any dependent child, business associate, or any business by which the person is employed or which the person represents will derive a direct monetary gain or suffer a direct monetary loss, as the case may be, by reason of his or her official activity.
Plaintiff seeks reversal of the Commission's decision with respect to the awarding of legal services to Taft/McSally on several grounds. First, plaintiff alleges that his actions did not rise to the level of a violation of the Ethics Code by the very terms of the statute. Second, plaintiff asserts that the manner by which certain Commission members conducted the hearings deprived him of certain due process rights. Similarly, plaintiff contends that the admittance of a particular witness' testimony was unfairly prejudicial thereby rendering the hearing violative of his due process rights. Last, plaintiff argues that the fines imposed by the Commission were excessive and otherwise unsupported by the evidence.
I.
Plaintiff initially contends that the Commission's decision was erroneous based upon the fact that any involvement which he may have had was insufficient as a matter of law to be found to have been in violation of sections 36-14-5(a) and 36-14-7(a). Specifically, plaintiff avers that his involvement with the selection of Taft/McSally was not in "substantial conflict," as that term is described pursuant to § 36-14-7(a), with the discharge of his duties as Governor of the State of Rhode Island. The Court disagrees.
Section 36-14-5(a) provides, inter alia, that no person subject to the Code of Ethics may have any interest, either direct or indirect, which is in substantial conflict with the proper discharge of his or her office. It is uncontradicted that plaintiff is subject to said Code of Ethics. G.L. 1956 (1988 Reenactment) § 36-14-3, as enacted by P.L. 1987, ch. 195, § 3. Pursuant to § 36-14-7(a), such a party has an interest in substantial conflict if he or she has reason to believe or expect that he or any business associate will derive a direct monetary gain by reason of his or her official activity.
The Commission determined that plaintiff was in violation of the aforementioned statutes by virtue of James Taft having gained the contract for outside counsel in the Jamestown Bridge case. In essence, plaintiff contends that such a finding was erroneous due to the fact that at the time which Taft/McSally was chosen as counsel James Taft and plaintiff were not business associates.[7] However, the Commission had before it ample evidence whereby it could find that plaintiff's contention was untenable.
Sometime in or about April of 1986, a corporation by the name of DiPrete/Laurienzo Construction Company ("DiPrete/Laurienzo") was formed. At the time of incorporation plaintiff owned two hundred (200) shares of said corporation.[8] Thereafter, sometime during August of 1987, a partnership trust agreement was executed whereby James Taft and DiPrete/Laurienzo agreed to form a partnership named Atwood Associates Realty Trust ("Atwood Associates"). According to the terms of the agreement DiPrete/Laurienzo owned approximately eighty (80) percent of the partnership while Taft owned the remaining twenty (20) percent. Consequently, plaintiff, as a one-third owner of DiPrete/Laurienzo, would have had a fairly substantial interest in Atwood Associates. This partnership would clearly place plaintiff and Taft within the definition of "business associate" as that term is defined in § 36-14-2(8).
Similarly, plaintiff contends that even assuming, arguendo, that he had interceded on Taft's behalf in having the Taft/McSally proposal chosen for the legal services contract he nevertheless did not violate § 36-14-5(a) or 7(a) due to the fact that he and Taft were not at the time business associates. Plaintiff avers that any involvement on his part would have had to have taken place prior to September 8, 1987, the day upon which Ms. Ridolfi generated a letter to the Taft/McSally law firm requesting a proposal. In that the formal partnership agreement forming Atwood Associates was not formally executed until one day later, on September 9, 1987, plaintiff contends that any involvement on his part in having Taft/McSally chosen preceded any business association with Taft. The Court rejects this argument.
Although it is true that the formal agreement forming Atwood Associates was not executed until September 9, 1987, it would be inconceivable to expect that prior to that date no negotiations between Taft or DiPrete/Laurienzo had occurred. In this respect, the Commission ostensibly found that at the time plaintiff directly or indirectly recommended Taft/McSally for the contract, they were business associates. This finding is ultimately given more support by the very terms of the agreement which made the formation of the partnership retroactive to August 15, 1987. The Court is therefore satisfied that any involvement which plaintiff may have had in choosing Taft/McSally for the Jamestown Bridge litigation occurred when plaintiff and James Taft were business associates and thus constituted activity falling within the ambit of sections 36-14-5(a), 5(d), and 7(a).
Consequently, plaintiff would have had an interest in substantial conflict, as defined by § 36-14-7(a), with the discharge of his duties inasmuch as he could have expected or had reason to believe that a business associate would derive a direct monetary gain by reason of his official activity. This is the exact type of monetary gain for a relative, friend, or business associate of an elected official which the General Assembly hoped to avoid in enacting the present version of the Code of Ethics.
Plaintiff next contends that there was insufficient evidence whereby the Commission could have found that he knowingly and willingly violated the provisions of the Code of Ethics, a standard necessary to constitute a violation pursuant to §36-14-13(9). Plaintiff challenges the Commission's findings based upon the alleged insufficiency of evidence as well as the Commission's apparent definition of "knowing and willful."
The Commission heard testimony from numerous witnesses who had either direct or indirect involvement with the selection process for counsel for the Jamestown Bridge matter. Neither plaintiff, James Taft, nor Matthew Gill admitted before the Commission that plaintiff directly recommended Taft/McSally. This is hardly surprising. Yet the Commission also heard testimony from Lynette Labinger.[9] Ms. Labinger testified that she had attended a meeting on December 24, 1990, at which plaintiff admitted having directly recommended the law firm of Taft/McSally for the contract. Ms. Labinger further testified that plaintiff made the recommendation to Gill who thereafter began the selection process. The Commission was thus faced with the classic witness credibility issue — an inconsistent recollection of events or occurrences from two (2) or more witnesses. The Commission was therefore free to weigh the credibility of all the witnesses and to decide the issue based upon whom they believed to be more credible. In so deciding, the Commission determined that Ms. Labinger's recollection of the December 24, 1990, meeting was more accurately representative of what had transpired. This Court is without authority to substitute its judgment for that of the Commission with respect to witness credibility. Costa v. Registry of Motor Vehicles, supra.
Accordingly, the Court finds that the Commission had sufficient evidence whereby it could find that plaintiff's actions were directly responsible for Taft/McSally being awarded the contract.
While the standard for the Commission to find a violation is that the official acted knowingly and willfully, the chapter is otherwise silent as to what actually constitutes a knowing and willful violation. Plaintiff asserts that his actions fell far short of the knowing and willful standard which our Supreme Court has adopted. In this vein, plaintiff asserts that the Commission's findings were premised upon a clear error of law. The Court disagrees.
Initially, the Court would point out that there exists some confusion as to which definition of knowing and willful was adopted.[10] The Commission avers that to be a knowing and willful violation plaintiff must have known or showed reckless disregard for the question as to whether his conduct was prohibited by statute. See, Trans World Airlines, Inc. v.Thurston, 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985). Plaintiff contends that absent specific intent to do that which the law forbids conduct cannot be shown to be knowing and willful.
In Carmody v. Rhode Island Conflict of Interest Commission,509 A.2d 453, 461 (1986), our Supreme Court adopted the definition of knowing and willful as espoused in Trans WorldAirlines, supra, which required that an official know or show reckless disregard as to whether his or her conduct was prohibited by statute. The Court in Carmody relied on theTrans World Airlines definition because it allowed an official to escape liability for a violation of the ethics regulation where said official acted reasonably and in good faith. However, the Court also recognized, under different circumstances, the definition of knowing and willful as espoused in Laffey v.Northwest Airlines, Inc., 567 F.2d 429 (D.C. Cir. 1976). InLaffey, the court held that a violation is knowing and willful when a person is cognizant of an appreciable possibility that he may be subject to the statutory requirements and fails to take steps reasonably calculated to resolve the doubt. Id. at 461-62.
Thus, where an official acts reasonably and in good faith he or she may escape liability. However, as the Court in Carmody
pointed out "where the mandate of the law is clear it is difficult to conceive of a violation that could be reasonable and in good faith." Carmody at 461. In such a situation, as it was in Carmody, the Laffey definition of knowing and willful controls. Hence, the Court held that since Thomas Carmody's actions were neither reasonable nor in good faith, his actions were knowing and willful because "he was cognizant of an appreciable possibility that he may be subject to the statutory requirements and he failed to take reasonable steps to resolve the doubt." Id.
In the instant case, the Commission had before it sufficient evidence to conclude that plaintiff's actions were both deliberate and calculated rather than reasonable and in good faith. Thus, the standard as articulated in Trans WorldAirlines, supra, is here inapplicable. Here, as in Carmody,
the mandate of the law is clear, rendering applicable the standard as espoused in Laffey. Further, it is not required, as plaintiff contends, that the official act with the specific intent to do that which the law forbids. See, Carmody at 459.
In the case at bar, it cannot be said that plaintiff was unaware of the possibility that any involvement he may have had in Taft being chosen as outside counsel would be in violation of the State's ethics laws. Plaintiff was undoubtedly acutely aware of certain prohibitions on his actions as they related to the Code of Ethics. Nonetheless, plaintiff embarked on a course of action which ultimately led to a violation of certain statutory requirements without taking any steps to avoid same. Such action was, under the standard recognized in Carmody, supra,
sufficient for the Commission to have found that plaintiff committed a knowing and willful violation of sections 36-14-5(a), 5(d), and 7(a).
II.
Plaintiff next avers that the manner in which the hearings were conducted was violative of his due process rights. Specifically, plaintiff alleges certain members of the Commission were not impartial in their attempt to ascertain the merits of the allegations. In support thereof, plaintiff references several transcript excerpts which he alleges indicate this lack of impartiality. The Court finds this contention to be without merit.
This Court is ever cognizant that the constitutional guarantees of fairness and due process extend to all persons appearing before administrative agencies. Withrow v. Larkin,421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975); LaPetiteAuberge, Inc. v. Rhode Island Commission for Human Rights,419 A.2d 274 (R.I. 1980). Further, the very nature of such an agency often requires that the board or commission act as both investigator and, later, adjudicator of the matter. Such a dual role, however, does not in and of itself render the agency's decision violative of the accused's constitutional rights. See,Id. at 52, 95 S.Ct. at 1467, 43 L.Ed.2d at 726-27; La PetiteAuberge, 419 A.2d at 284.
Moreover, in examining the decision of an administrative agency there is a presumption which favors the agency's findings thereby placing the burden upon the party challenging the action to present evidence sufficient to rebut this presumption. Gormanv. University of Rhode Island, 837 F.2d 7, 15 (1st Cir. 1988). Absent this evidence, the presumption of honesty and integrity in the administrative hearing remains and the constitutional challenge must fail. Withrow, supra; Davis v. Wood,444 A.2d 190, 192 (R.I. 1982).
In the instant case, plaintiff has failed to present sufficient evidence to rebut this presumption. The mere inquisitive nature, aggressive or not, of the Commission members does not lend itself to a violation of due process. In reviewing the many pages of transcripts in the instant matter, the Court is convinced that the Commission was merely effectuating that which the Legislature contemplated in granting the Commission the authority to resolve matters with respect to the State's ethics laws. The Court finds that the Commission members were both impartial and unbiased in their respective roles. Consequently, plaintiff's due process challenge must fail.
III.
Plaintiff next contends that the Commission erroneously allowed a witness, who was not originally disclosed in discovery, to testify. It is plaintiff's contention that allowing the witness to testify at the "eleventh hour" unfairly prejudiced him thereby precluding him from his procedural right to a fair hearing. The Court rejects this contention.
Pursuant to G.L. 1956 (1990 Reenactment) § 36-14-13(c)(2), the Commission was empowered to promulgate certain rules with respect to discovery procedures which were to be designed to protect each party to the proceeding from unfair surprise. In effectuating this power the Commission enacted regulation 36-14-13009, as amended in December of 1990, which provided that "discovery shall be conducted solely pursuant to the terms of this regulation." Said regulation provides that each party to a Commission proceeding shall be provided with, inter alia, the names of those witnesses who are expected (emphasis added) to testify. In this light, each party would be afforded an opportunity to prepare his or her respective cases based upon a list of witnesses who the opposing side, at the time of preparation of the list, was anticipating would testify.
On November 19, 1991, the Commission heard testimony from Lynette Labinger. Ms. Labinger, a law partner of the attorney-designee, John Roney, was present at a meeting held in the Governor's office on December 24, 1990. This meeting was held at plaintiff's request in order to apprise him of the status of the Common Cause complaint. As was previously mentioned, it was during this meeting that plaintiff allegedly admitted having recommended the law firm of Taft/McSally for the legal services contract.
On November 12, 1991, one week prior to Ms. Labinger's appearance before the Commission, plaintiff had testified that at the December 24 meeting he had not made any specific recommendation to Matthew Gill with respect to the selection of Taft/McSally. Despite repeated attempts by Mr. Roney to refresh plaintiff's recollection plaintiff steadfastly denied ever having made the recommendation. In that Mr. Roney was also present at the meeting and apparently also recalled plaintiff having admitted recommending Taft/McSally, he felt compelled to elicit the truth. It was only at this hearing that Mr. Roney announced that he would be adding Ms. Labinger as a rebuttal witness.
Thus, at the time that the Commission was preparing its case-in-chief Mr. Roney ostensibly had no reason to believe that plaintiff would testify differently from what Roney had recalled having heard at the December 24 meeting. Consequently, he could not have anticipated having to call Ms. Labinger as a rebuttal witness. In this respect, Roney was under no obligation to provide plaintiff with Labinger's name during the discovery stage due to the fact that, at that precise time, she was not expected to testify. Furthermore, it is difficult to conceive how Labinger's testimony, elicited on November 19, could be considered unfair surprise. Not only was counsel for plaintiff apprised on November 12 of Labinger's impending testimony, but counsel was also aware of her presence at the December 24 meeting. By promptly notifying both the Commission and plaintiff of Ms. Labinger's impending testimony, Mr. Roney comported with the requirements of Ethics Regulation 36-14-13009(d). Thus, the Court finds that allowing Ms. Labinger to testify was not unfairly prejudicial so as to render the hearing constitutionally defective.
IV.
Plaintiff's last challenge to the Jamestown Bridge matter is that any and all fines which were imposed by the Commission were either excessive or unsupported by the evidence. While the Court is not in agreement, said issue shall be discussed, infra.
The Olney Pond Contract
Prior to plaintiff's election as Governor in November of 1984, a study of public records had disclosed that a few very select architectural and engineering firms had received the vast majority of State contracts in those respective fields. This fact had ostensibly become a hot campaign issue and in response thereto plaintiff made certain promises to take "the politics" out of obtaining certain State contracts for hire.
On November 4, 1985, plaintiff issued Executive Order 85-23,[11] the purpose of which was to "conduct the business of the State in an open and orderly manner." Said Order mandated that all State contracts for architectural or engineering services equal to, or in excess of, twenty thousand dollars ($20,000.00) be awarded only after first having passed through an architectural and engineering services selection committee (the "AE Committee").[12] The primary function of the AE Committee was to examine the qualifications of prospective contractors and to then provide a list of qualified firms to the Director of Administration for ultimate selection.
Pursuant to the terms of the Executive Order, the AE Committee was to review any and all proposals which were submitted by private firms in response to solicitations for State hire. Once the qualifications and competency of the firms to complete the project were established, the committee was thereafter required to prepare and approve a list of no less than three (3) firms which they believed were best technically and professionally qualified to fulfill the specific project requirements. This "short list," as it came to be known, was then to be forwarded to the Director of Administration who was — at least according to the terms of the Executive Order — to make the final selection. In theory, the process was designed to more effectively and honestly award State contracts. In practice, however, at least with respect to the Olney Pond contract, the Ethics Commission found that this theory gave way to political favoritism.
At the time of the promulgation of Executive Order 85-23, Frederick Lippitt was then Director of the Department of Administration. Mr. Lippitt was appointed by plaintiff on October 1, 1985. Mr. Lippitt testified that prior to his appointment he had several conversations with plaintiff. One of these conversations concerned the selection of vendors for architectural and engineering services. It was Mr. Lippitt's recollection that plaintiff had stated that he (plaintiff) would like to pick the vendor for such contracts so long as the vendor was qualified.[13] With this backdrop of the selection process for architectural and engineering services the Court turns to the facts giving rise to the genesis of the complaint.
In or about the middle of 1987, DEM applied to the United States Environmental Protection Agency for a grant in order to conduct a water quality study in the Olney Pond located in Lincoln Woods State Park. Towards the latter part of 1987 a one hundred thousand dollar ($100,000.00) grant was awarded.[14]
DEM thereafter provided public notice of the contract and subsequently received eight (8) proposals.
Pursuant to the terms of the grant, DEM was required to form an in-house review committee designed to evaluate all firms which had forwarded proposals to conduct the Olney Pond project. In so doing, the DEM review committee devised a point system whereby each firm was to be rated in certain areas. After reviewing the eight (8) proposals submitted, and based upon qualifications and bid price, the DEM committee determined that only two (2) of the firms were acceptable to conduct the study. These two (2) firms, Lycott Environmental Research, Inc. and I.E.P., Inc., ultimately received the highest point total and were therefore recommended by the DEM committee for the project.
After having received the bid proposals the AE Committee undertook to perform their primary function. On April 8, 1988, the AE Committee convened to consider the awarding of certain State contracts including the Olney Pond contract. It was at this meeting that Judith Benedict, then Chief of Planning and Development at DEM and also a member of the AE Committee, informed the other members that the DEM in-house review committee had concluded that Lycott and I.E.P. were the only acceptable vendors for the contract. The AE Committee thereafter reviewed all eight (8) proposals and ultimately selected four (4) of the firms to be placed on the "short list."[15]
In addition to Lycott and I.E.P., the AE Committee unanimously voted to place the names of Tutela Engineering Associates, Inc. ("Tutela")[16] and Environmental Scientific Corporation/Rhode Island Analytical Laboratories, Inc. ("Scientific") on the list. It is of some significance that Lycott, I.E.P., and Scientific were ranked first, second, and third, respectively, by the DEM in-house committee. The real concern of the Ethics Commission was how Tutela, which was ranked seventh out of eight, came to be placed on the "short list." This low ranking was due to the fact that Tutela had been judged to be less qualified than the other firms. Additionally, Tutela had submitted a bid well in excess of the grant amount.[17] The Commission was unable to determine who amongst the members of the AE Committee had proposed that Tutela and Scientific be added to the "short list."
In compliance with Executive Order 85-23, the AE Committee thereafter, in a manner which the Commission found to be odd, forwarded the "short list" to then Director of Administration Lippitt's office. Rather than placing the firms in order of qualification the names were placed in alphabetical order. Mathias Santos, Lippitt's assistant, then prepared and forwarded to either Lippitt or plaintiff a cover sheet detailing the names of the firms, the proposed project, and a summary of previous State contracts awarded to each vendor.[18]
On April 15, 1988, Tutela Engineering was chosen for the Olney Pond contract. Almost immediately thereafter, on May 3, 1988, Judith Benedict dispatched a memo to Lippitt objecting to Tutela's selection. This objection gave rise to a series of events and memos which ultimately led to the rescinding of the award to Tutela. Finally, on September 26, 1988, Lippitt advised Purchasing Agent Lynch that he had reconsidered the award and had chosen Lycott to complete the study.
Based upon the numerous hours of testimony as well as the evidence presented, the Commission determined that, with respect to the awarding of the Olney Pond contract, plaintiff had committed a series of violations of the State's ethics laws. Specifically, the Commission found that plaintiff had: (1) engaged in conduct which was in substantial conflict with the discharge of his office; (2) that said conduct had resulted in financial gain for plaintiff or a business associate; and (3) that plaintiff had engaged in an improper solicitation or acceptance of a political contribution. Such actions were found to be violative of sections 5(a), 5(d), 5(g), and 7(a) of Chapter 14, Title 36, of the General Laws, as enacted by P.L. 1987, ch. 195, § 3.[19] Further, the Commission found that plaintiff had failed to file a conflict of interest statement as is mandated pursuant to the terms of § 36-14-6 of the General Laws.
The Commission subsequently assessed civil penalties totaling fifteen thousand dollars ($15,000.00) against plaintiff for his actions relating to the awarding of the Olney Pond contract to Tutela. In the matter presently before the Court plaintiff seeks reversal of the Commission's findings based upon several alleged errors of law.
I.
As he did in the Jamestown Bridge matter, plaintiff asserts that neither § 36-14-5(a) nor § 36-14-7(a) are applicable due to the fact that any action which plaintiff may have taken was not in substantial conflict with the discharge of the duties of his office. As was discussed earlier, it is necessary to examine both the requirements of § 36-14-5(a) and § 36-14-7(a) in order to determine whether the Commission's findings were occasioned by clear error of law or are otherwise erroneous.
The Commission found that plaintiff had engaged in actions in substantial conflict with the discharge of the duties of his office by virtue of plaintiff having recommended or selected Tutela for the Olney Pond contract. In order for such a violation to stand it was necessary for the Commission to find that either plaintiff or Tutela had derived a direct monetary gain as a result of plaintiff's official activity.
Plaintiff contends that no substantial conflict existed inasmuch as neither he nor a business associate derived a direct monetary gain. However, a careful reading of § 36-14-7(a) as well as an analysis of the relevant facts discloses the deficiencies in plaintiff's contention.
Section 36-14-7(a) provides that a person subject to the chapter has an interest in substantial conflict with the discharge of his duties when he has reason to believeor expect (emphasis added) that he will derive a direct monetary gain by reason of his official conduct. The statute does not specifically require that the person actually have received the monetary gain. Rather, it prohibits an official from engaging in conduct which could reasonably lead to that person deriving such a gain. In this respect, the intent of the Legislature was a preventive one: to preclude an official from embarking upon an avenue of potential financial gain.
In recommending or selecting Tutela for the Olney Pond contract plaintiff took a giant step on that avenue. Obviously, plaintiff was acutely aware that Tutela was a significant contributor to his gubernatorial campaigns. These contributions directly benefited plaintiff in the form of providing valuable and essential monies for plaintiff's campaigns. The Commission thus found that plaintiff had reason to believe or expect that his actions could lead to a direct monetary gain by taking action to have Tutela selected or recommended for the contract. Consequently, plaintiff's actions were in substantial conflict with the discharge of his official duties. Thus, the Commission had ample evidence before it to find that plaintiff had violated sections 36-14-5(a) and 36-14-7(a) of the General Laws.
In a similar vein, plaintiff argues that the Commission erred in finding that he had violated § 5(d) of the chapter and title in question. Said section provides that no person subject to the Code of Ethics shall use his office for financial gain other than that provided by law. It is plaintiff's contention that since any financial gain obtained by him from Tutela was in the form of political contributions which are, subject to certain limitations, allowed under the law, no violation could have occurred. Taken to its illogical conclusion, plaintiff's argument would allow a public official to exert his or her authority to award State business contracts to political cronies so long as any reciprocal benefit to the official was in the form of a political contribution. Such an argument, if accepted by the Court, would seriously derail any hope of stopping the publically perceived speeding train of political corruption, real or not, which the enactment of the Code of Ethics was meant to effect. The Court therefore summarily rejects plaintiff's argument and holds that the Commission had ample evidence to find that plaintiff had violated § 36-14-5(d).
Plaintiff next asserts that the Commission erred with respect to finding that he had violated § 36-14-5(g). Said section provides that no person subject to the Code of Ethics shall, solicit or accept, inter alia, a political contribution based upon any understanding that the person's conduct would be influenced thereby. Plaintiff avers that no evidence existed before the Commission that any understanding between plaintiff and Tutela existed to prove that in return for plaintiff's recommendation of Tutela for certain State contracts, Tutela would correspondingly make certain contributions to plaintiff's gubernatorial campaigns. In essence, plaintiff contends that the lack of a "smoking gun" demonstrates that the Commission was in error. The Court disagrees.
The absence of any formal understanding, written or oral, is hardly surprising considering the secretive nature with which such an agreement would have to be conceived. Many agreements of this type are necessarily arranged with a modicium of — if any at all — evidence which would tend to corroborate the fact that an agreement existed. Consequently, there would rarely exist an instance where a true "smoking gun" would materialize. As such, it is highly doubtful that the Legislature intended to prohibit only those activities wherein a clear and unambiguous understanding of political influence was shown. Therefore, it was incumbent upon the Commission to make reasonable inferences, based upon the evidence and testimony adduced at the hearings, as to whether or not such an agreement existed. After careful review of the entire record, the Court is satisfied that the Commission so reasonably inferred.
Plaintiff's last bastion of hope in reversing the Commission's decision, at least with respect to the provisions of the statutes in question, lies with whether or not there was a knowing and willful violation of the law. Mindful of the definition of that standard as articulated in Carmody, supra,
this Court turns to the relevant facts as to whether or not plaintiff knowingly and willfully acted to have Tutela chosen for the Olney Pond contract.
Initially, the Court would point out that plaintiff places much emphasis on the method whereby Tutela was placed on the "short list." In essence, plaintiff avers that there was no evidence before the Commission to demonstrate that he instructed someone or otherwise caused Tutela to be placed on the list. In this respect, plaintiff seems to contend that it cannot be reasonably inferred that he in any way took any action to have Tutela awarded the contract. Plaintiff further attempts to cloud the issue by alleging that it was error on the part of the DEM in-house committee, and later Judith Benedict, to have even considered placing Tutela on the "short list." However, these arguments are nothing more than a clever attempt to create a smokescreen in order to conceal the real issue — whether plaintiff knew or should have known that he was in danger of violating the Code of Ethics by taking any action to have Tutela selected.
Moreover, exactly how Tutela was placed on the "short list" is academic. The fact remains that once Tutela was placed on the list, irrespective as to the means, plaintiff admitted before the Commission that he had informed Director of Administration Lippitt that Tutela was his personal choice for the contract. Consequently, it was not necessary for plaintiff to have placed Tutela on the "short list." Improper action on the part of plaintiff could have occurred by either recommending that Tutela be placed on the "short list" or having recommended or chosen Tutela once the "short list" was forwarded to Lippitt.[20]
The Court is further persuaded by Lippitt's testimony before the Commission. Mr. Lippitt testified that prior to his appointment as Director of Administration plaintiff and he had several conversations concerning certain performance expectations. During the course of one of these conversations, Lippitt testified that plaintiff desired and expected to make all choices for architectural and engineering contracts. Such an expectation was directly in contravention of the terms of the Executive Order which called for the choice to be made by Lippitt. Additionally, Lippitt testified that although the Executive Order purported to give him the final authority to select firms for architectural and engineering contracts, plaintiff made it readily obvious that the final selection would be made by him rather than Lippitt.[21]
It follows, therefore, that the Commission was justified in finding that plaintiff had knowingly and willfully violated the respective statutes in that he was cognizant of an appreciable possibility that he might be subject to the statutory requirements and he failed to take steps reasonably calculated to resolve the doubt. Carmody at 461.
II.
Plaintiff next contends that the Commission, during the course of the hearings, improperly allowed certain evidence to be heard and that this evidence was used as a basis for the Commission's findings. Contending that much of this evidence constituted inadmissible hearsay,[22] or was otherwise irrelevant or immaterial to the proceedings, plaintiff seeks reversal of the Commission's decision. The Court rejects plaintiff's arguments on two grounds.
Pursuant to Ethics Commission Regulation 36-14-13002, all adjudicative proceedings are governed by the rules of evidence as referenced in G.L. 1956 (1988 Reenactment) § 42-35-10. In accordance therewith, the Commission is prohibited from allowing to be heard, inter alia, any irrelevant or immaterial evidence. With respect to hearsay testimony, numerous courts have held that administrative agencies are not bound by the formal and rigid application of the hearsay rule which has been more widely and readily applied to trials by jury. See, e.g., Richardsonv. Perales, 402 U.S. 389, 409-10, 91 S.Ct. 1420, 1431, 28 L.Ed.2d 842, 857 (1971); Federal Trade Commission v. CementInstitute, 333 U.S. 683, 705-06, 68 S.Ct. 793, 805-06, 92 L.Ed. 1010, 1037 (1948); DePasquale v. Harrington, 599 A.2d 314, 316 (R.I. 1991); see, also, 4 Stein, Mitchell, Mezines,Administrative Law, § 26.01 at 26-1 (rev. perm. ed. 1992).
More specifically, § 42-35-10(a) allows an administrative agency to consider hearsay evidence where "it is a type commonly relied upon by reasonably prudent men in the conduct of their affairs." While admittedly a standard not capable of exact definition, it is nevertheless designed to afford an administrative agency the necessary flexibility to advance the public welfare, DePasquale, supra at 317, so long as prudent persons in like situations would rely upon such hearsay testimony. Thus, a hearing officer may take into account evidence that would otherwise be excluded in a trial by jury if it would be prudent to do so. Id.
In light of the above, even assuming that the Commission did allow into evidence certain hearsay testimony it was nevertheless authorized to do so. After having reviewed many pages of the transcript of the hearings the Court is satisfied that the Commission relied upon that hearsay evidence which a prudent person would have relied upon in attempting to effect a balance between reliability of certain evidence and enforcement of the Code of Ethics. Indeed, it would be an isolated incident where a violation of the Code, as alleged herein, would be able to be proven without at least a modicium of hearsay. Accordingly, the Court finds that the Commission prudently allowed certain hearsay testimony to be admitted.
Moreover, the instant case is not, as plaintiff asserts, analogous to Wood v. Ford, 525 A.2d 901 (R.I. 1987). In Wood,
our Supreme Court found that an administrative agency had rendered a decision based upon improperly admitted hearsay evidence. In reversing the agency's decision the Court determined that absent the evidence the agency would not have been able to find as it did. Id. at 903. In the case at bar, the Commission did not render its decision solely on hearsay testimony. Rather, the decision was based on other reliable and probative testimony and evidence adduced at the hearings. Consequently, Wood is here inapplicable.
Plaintiff further contends that the Commission allowed irrelevant and immaterial testimony to be considered thus violating his right to a fair hearing. The Court disagrees.
In order to be relevant, testimony must relate to the issue in question. To be material it must have probative weight. That is, it must be reasonably likely to influence the tribunal in making a determination required to be made. See, Weinstock v.United States, 231 F.2d 699, 701 (D.C. Cir. 1956); see,also, 1 Wigmore, Evidence § 2 (3d. ed. 1940).
In trying to determine whether or not plaintiff had violated the Code of Ethics it was necessary for the Commission to delve into the myriad mechanisms whereby certain State contracts were awarded. Correspondingly, the Commission was required to ascertain any and all facts which led up to or resulted from Tutela being awarded the Olney Pond contract. The Court is satisfied, after reviewing the transcript, that the testimony offered was relevant to the issue of whether plaintiff had improperly acted in having Tutela selected for the contract. Similarly, that the testimony was material in that it would reasonably assist the Commission in reaching such a conclusion.
III.
Plaintiff next asserts that the Commission's findings of fact were inadequate to support their decision. In support thereof plaintiff cites Sakonnet Rogers, Inc. v. Coastal ResourcesManagement Council, et al, 536 A.2d 893, 896 (R.I. 1988), wherein our Supreme Court held that an administrative decision that fails to include findings of fact which are required by statute cannot be upheld. In Sakonnet, the Court reversed a decision by the Coastal Resources Management Council ("CRMC") due to the fact that CRMC had failed to support their decision with a concise and explicit statement of the underlying facts supporting the findings as is required pursuant to the terms of G.L. 1956 (1988 Reenactment) § 42-35-12. The instant case is distinguishable.
The Commission made, all together, seventy-six (76) findings of fact of which at least forty-two (42) concerned the selection of Tutela Engineering as contractor for the Olney Pond study. Said findings constituted a concise and chronological statement of the procedures which were used in selecting Tutela for the project. Within these forty-two (42) findings of fact exists more than sufficient evidence to support the Commission's finding that plaintiff had improperly engaged in unethical activity which ultimately led to Tutela being awarded the contract. Unlike the CRMC in Sakonnet, supra, the Commission in the instant case provided this Court with adequate findings of fact necessary for judicial review. Such action comports with the statutory requirements of § 42-35-12. East Greenwich Yacht Club v. CoastalResources Management Council, 118 R.I. 559, 569, 376 A.2d 682, 687 (1977).
IV.
Plaintiff next asserts that he was deprived of his constitutional right to a fair hearing as a result of bias on the part of a member of the Commission's adjudicative panel. Plaintiff contends that this bias manifested itself due to the fact that the particular member was acquainted with a witness who appeared before the panel. This contention, however, is wholly lacking in merit.
On December 4, 1991, the Commission heard testimony from Mathias Santos who, at the time of the awarding of the Olney Pond contract, was Executive Assistant to Director of Administration Fred Lippitt. Prior to Mr. Santos being questioned, panel member Cheryl M. Fisher-Allen advised the panel that she was acquainted with Santos. This acquaintance, as described by Fisher-Allen, could best be categorized as distant.[23] Mr. Santos gave certain testimony which required counsel for plaintiff to rebut in the form of testimony from plaintiff's son, Dennis DiPrete. Plaintiff contends that Fisher-Allen's acquaintance with Santos thus made it impossible for the credibility of each witness to be properly weighed. This impossibility, plaintiff argues, rendered the hearings impartial and unfair.
At the outset, the Court would point out that it is mindful that the rule as to disqualification of a judge for bias or lack of impartiality is generally the same for administrative agencies. National Labor Relations Board v. Donnelly Co.,330 U.S. 219, 236-37, 67 S.Ct. 756, 91 L.Ed. 854 (1947). As such, the party challenging the impartiality or prejudice of a hearing officer carries a substantial burden. See, State v. Nidever,120 R.I. 767, 769-70, 390 A.2d 368, 370 (1978).
In the case at bar, plaintiff has failed to sustain his burden. The mere fact that Fisher-Allen was acquainted with Santos is in and of itself insufficient to demonstrate that she or the other Commission members acted with bias. Plaintiff has failed to establish the existence of any facts which would indicate that the Commission acted improperly due to Fisher-Allen's acquaintance. Indeed, in a state the size of Rhode Island it would be inconceivable to demand recusal based upon mere acquaintances. See, State v. Clark, 423 A.2d 1151, 1158 (1981).
V.
The Court now turns to the question as to whether or not the fines imposed were excessive and otherwise unsupported by the evidence.[24] In both the awarding of the Jamestown Bridge and Olney Pond contracts the Commission assessed fines of ten thousand dollars ($10,000.00), respectively. Additionally, the Commission assessed a fine of five thousand dollars ($5,000.00) for plaintiff not having filed a conflict of interest statement as to each matter.[25] In total, plaintiff was fined thirty-thousand dollars ($30,000.00).
Plaintiff avers that these fines were excessive in light of our Supreme Court's holding in Carmody, supra. However, the instant case and Carmody are easily distinguishable. InCarmody, the Court reviewed the assessment of penalties assessed by the Conflict of Interest Commission in two (2) separate cases. In the first, a penalty of one hundred fifty dollars ($150.00) was assessed against a Narragansett town clerk for failing to file an annual financial-statement form. In the second case, a fine of five hundred dollars ($500.00) was assessed against a member of the Board of Canvassers for the City of Warwick for improperly validating her own nomination papers. In neither case was financial gain to either defendant at issue. This significant fact places Carmody squarely at odds with the instant case.
In the case at bar, plaintiff, a business associate, and/or a significant political contributor stood to gain significant sums of money as a result of the awarding of the two (2) State contracts. The Jamestown Bridge litigation alone, as of the date of the hearings, has cost the State nearly three-quarters of a million dollars. Tutela stood to gain nearly eighty thousand dollars ($80,000.00). The Commission did not abuse its discretion, then, in assessing fines totaling thirty thousand dollars ($30,000.00) for plaintiff's improper actions in having the contracts awarded to Taft/McSally and Tutela, respectively.
In conclusion, the Court would point out that the intent of the present form of the Code of Ethics is unambiguously embodied in § 36-14-1. Said section provides that:
 [I]t is the policy of the State of Rhode Island that public officials and employees must adhere to the highest standards of ethical conduct, respect the public trust and the rights of all persons, be open, accountable, and responsive, avoid the appearance of impropriety, and not use their position for private gain or advantage.
The Commission, in carrying out the intent of the Code of Ethics, has perhaps instilled a greater degree of accountability within the higher echelon of State government. Though the Office of the Governor is arguably the highest office in government within the State, it nevertheless must abide by the terms of a Code of Ethics designed to protect the very citizens for whom the Governor serves. Indeed, a compelling argument could be made that the people of Rhode Island expect their Governor to conduct his or her affairs with a higher degree of ethical conduct than the present form of the Code requires. Certainly, they neither deserve nor expect less.
For the reasons herein above set out, this Court finds that the State Ethics Commission's decision rendered on December 20, 1991, which found former Governor Edward D. DiPrete to be in violation of certain provisions of the State's Code of Ethics was supported by competent, reliable, and probative evidence in the whole record. Accordingly, plaintiff's appeal is dismissed and the Commission's findings are hereby affirmed.
[1] Chapter 14 of Title 36 of the General Laws entitled "Conflict of Interest" was repealed in its entirety effective June 25, 1987, by P.L. 1987, ch. 195, § 3. Said public law enacted the present Code of Ethics which authorized the State Ethics Commission to be formed. The Commission was therefore without jurisdiction to consider any allegations of wrongdoing occurring prior to its statutory grant of power.
[2] The officials primarily involved with making this determination were Matthew Gill, head of DOT, and Veronica Ridolfi, DOT's Chief Legal Counsel. Prior to deciding upon whether to hire outside counsel Ms. Ridolfi contacted the Department of the Attorney General to inquire whether or not they would represent the State in this matter. Ms. Ridolfi was advised that the magnitude of the suit necessitated the hire of outside counsel.
[3] Ms. Ridolfi's testimony before the Commission was that someone in the Governor's Executive Office had advised Gill to limit the search for outside counsel to a local firm. Matthew Gill denied ever having made such a recommendation at the behest of the Governor.
[4] James Taft, Jr., who preceded plaintiff as Mayor of the City of Cranston, and who is a close friend and political ally of plaintiff, was and is a principle partner in the firm. Due to this relationship, Ms. Ridolfi immediately expressed concern to Gill over adding the firm to the list, but was advised to do so nonetheless.
[5] Separate contracts were required due to the fact that the joint venture was not a legal entity. Joseph Kelly, of Carroll, Kelly Murphy and James Taft, Jr., of Taft/McSally, were the recipients of the contracts.
[6] Whether plaintiff was in violation of § 36-14-6 will be discussed, infra.
[7] Section 36-14-2(8) defines a business associate as "a person joined together with another person to achieve a common financial objective."
[8] Plaintiff's son, Dennis DiPrete, and son-in-law, Paul Laurienzo, each owned an additional two hundred (200) shares of the corporation.
[9] Whether Labinger's testimony was properly before the Commission will be discussed, infra.
[10] It is of import that irrespective of which definition was employed in the case at bar the Commission had before it ample evidence to find that plaintiff's actions were knowing and willful.
[11] Said Executive Order was subsequently superseded by Executive Order 86-13 issued on May 3, 1986. Though there were some minor changes, the intent of the Order remained unchanged.
[12] The AE Committee was comprised of four members. At the time of the awarding of the Olney Pond contract these members were: Dennis Lynch, the State Purchasing Agent, designated as Chairman of the Committee; Mathias Santos, the Director of Administration's designee; Gilbert Parrillo, a public member appointed by the Governor; and Judith Benedict, who was representing the Department of Environmental Management ("DEM"), the agency requesting the service.
[13] It is significant that this conversation took place prior to the issuance of Executive Order 85-23. If true, Mr. Lippitt would not have had the authority to make the final selection as the intent of the Order prescribed. Rather, plaintiff would have made the final selection, a fact he consistently denied during the hearings.
[14] While the original grant was in the amount of one hundred thousand dollars ($100,000.00), DEM was required to expend approximately one-fifth of that amount in preparing for the implementation of the project. Consequently, only eighty thousand dollars ($80,000.00) remained to conduct the actual study.
[15] Executive Order 85-23 mandated that at least three (3) firms be included on the list. It is unclear why in this instance the AE Committee decided to place an additional firm on the "short list."
[16] Tutela Engineering Associates is a Rhode Island corporation which engages in environmental and civil engineering. The corporation was formed in 1982 and is principally owned by Domenic Tutela. Approximately two-thirds of all of Tutela's work involves various state or municipal contracts. Testimony before the Commission revealed that during 1984-1988 Domenic Tutela, either individually or as representative of his corporation, contributed over twenty-one thousand dollars ($21,000.00) to plaintiff's gubernatorial campaigns.
[17] Tutela submitted a bid of one hundred seventy-eight thousand dollars ($178,000.00) to complete the Olney Pond study — a figure well in excess of the eighty thousand dollars ($80,000.00) which remained out of the original grant. By comparison, Lycott had submitted a bid of seventy-eight thousand dollars ($78,000.00).
[18] On this particular cover sheet Tutela was the lone firm which had received a previous contract, having obtained a fifteen thousand dollar ($15,000.00) contract from the State in November of 1987.
[19] Section 36-14-5(g) provides:
5(g) No person subject to this code of ethics or spouse (if not estranged) or dependent child or business associate of the person or any business by which the person is employed or which the person represents, shall solicit or accept any gift, loan, political contribution, reward, or promise of future employment based on any understanding that the vote, official action, or judgment of the person would be influenced thereby.
[20] Plaintiff also argues that while he may have "recommended" Tutela for the contract he did not actively "select" Tutela; thus, he engaged in no improper conduct. The Court submits that plaintiff's argument is more one of semantics than substance. The spirit and intent of the Ethics law would have been violated had plaintiff taken part in any action, direct or indirect, which caused Tutela to be awarded the contract.
[21] With respect to the instant complaint, plaintiff argues that because the initial decision to hire Tutela was subsequently rescinded, Tutela never actually received the contract. Thus, plaintiff avers, he had not engaged in any prohibited conduct. Such a contention, however, does not warrant an extended discussion. The mere fact that Lycott was re-selected for the contract does not negate the fact that plaintiff engaged in improper actions in having Tutela initially selected to conduct the Olney Pond study. But for the strenuous objections of certain DEM officials, Tutela would undoubtedly have received the contract.
[22] Plaintiff has offered many instances wherein it is alleged that hearsay testimony was improperly allowed into evidence. Although the Court is in disagreement with plaintiff as to whether or not certain testimony was actually hearsay, it need not resolve the conflict due to its decision that follows.
[23] Fisher-Allen informed the panel that she and Santos grew up in the same neighborhood and that their families knew each other well. She further testified that she had seen Santos only twice during the previous ten (10) years and that on both occasions the meetings were professional in nature.
[24] Pursuant to § 36-14-13(e)(3) the Commission was authorized to assess a civil penalty of not more than ten thousand dollars ($10,000.00) for each violation of the chapter.
[25] Pursuant to § 36-14-6 plaintiff was required to prepare and deliver a statement of conflict of interest to the Commission. It is uncontradicted that plaintiff failed to file such a statement. Thus, the Commission was warranted in finding that plaintiff had violated said provision.