DECISION
This is an appeal by Edward Wilcox (Wilcox) from a final decision of the Department of Children, Youth and Families (DCYF), dated December 18, 1995. Jurisdiction in this Superior Court is pursuant to G.L. 1956 (1993 Reenactment) § 42-35-15.
Facts/Travel
The facts giving rise to this appeal stem from a complaint received by DCYF concerning allegations of child abuse and/or neglect. The complaint, initiated by phone, was called into the DCYF Child Abuse and Neglect Tracking System (CANTS) hotline and stemmed from an incident which occurred on July 13, 1995 at East Main House in Middletown. East Main House is a residential group home for boys, administered by child and family services of Newport County, where Wilcox was employed. Wilcox is alleged to have provided alcoholic beverages to an adolescent resident of the home, whom shall be called John Doe (John), age 16.[1]
DCYF Inspector Raymond Horn (Horn) and Children Protective Investigator Joseph Coleman (Coleman) were assigned to investigate the allegations who responded to East Main House the next day, July 14, 1995 at 10:00 a.m. Coleman interviewed the residents, John, James Smith (James), and Mike Moore (Mike), while Horn interviewed Mary Moe (Mary), John's girlfriend, John's mother, as well as other staff members of East Main House. Horn also interviewed Wilcox.
In the course of their investigation, Horn and Coleman learned that Wilcox had been employed at East Main House for approximately five months as a senior residential counselor, but was about to leave to begin employment for DCYF. Wilcox was scheduled to participate in the training academy for the Rhode Island Training School beginning on July 17, 1995 with July 13, 1995 being his last day of full-time employment at East Main House.
On July 13, 1995, another East Main employee, Jennifer Souci (Souci) reported to work at approximately 4:00 PM. Wilcox was also scheduled to work at 4:00 p.m. as well but had called the House Manager Ken Findlay (Findlay) earlier to notify him that he would be late. In the interim, Souci took the residents out in the house van and returned to the house at approximately 6:00 p.m. By the time they returned, Wilcox had arrived. Wilcox maintains that upon arrival he found the house to be empty, unlocked and in a state of disarray, with the leg of a coffee table broken off and the chairs all over the place. Wilcox also testified that there were empty bottles of rum around the house and empty Pepsi bottles that smelled of rum. Wilcox reported that Souci appeared anxious and nervous.
John then asked Wilcox to take him to the store to purchase cigarettes and the two left in the house van for a Cumberland Farms store located just down the road. John stated that while they were out, Wilcox stopped and purchased a six-pack of beer which the two then split while parked behind O'Brien's Pub in Newport.
Wilcox maintains, however, that John appeared intoxicated and smelled of beer when he arrived at the house. Wilcox further alleges that while in the van, several cans of beer rolled out from under the seats. Wilcox states that while he did park the van behind O'Brien's Pub, it was to allow John to use the port-a-john available in the rear of the building and to wait and let John "sober up" as he was concerned for John's safety, as well as the others at the home.
After about an hour and one half, Wilcox and John returned to the home. Two witnesses reported that upon return, Wilcox appeared visibly intoxicated. James, age 15, who is another resident of the house, stated that Wilcox had blood shot eyes, was swaying when he walked and slurring his speech, and that Wilcox fell on the coffee table and broke it. Souci also sensed the smell of alcohol on Wilcox's breath and further stated that she overheard Wilcox on the phone with John's girlfriend, Mary. John had called Mary and was speaking with her when Wilcox got on the phone and stated "he [John] can really put them away, we just split a six pack of Molson Ice." Mary subsequently corroborated this account of events. Wilcox maintains that he was not intoxicated, did not speak with Mary and upon return, simply talked to the residents while watching some television.
About one hour later, at 9:00 p.m., Wilcox left the home again, this time in the company of John and the other house residents, James and Mike, and drove to Second Beach in Newport. They returned from the beach about one half hour later.
Just prior to Wilcox leaving for the beach, Souci had called Findlay and the local police to inform them of Wilcox's condition. As a result, when Wilcox returned at approximately 9:30, he received a call from the program manager, Christine Jones (Jones), who told Wilcox that he was intoxicated and had to leave the house. Wilcox denied the allegations and invited her to send the police or an administrator to verify it. Jones told Wilcox that he could speak to Findlay the next morning but once again asked him to leave the house. Wilcox stated that he left the house and went across the street to wait for an administrator or the police to arrive and when none arrived, he eventually left.
John was taken to Newport Hospital for a blood alcohol test and seen by R.W. Altreuter, M.D. Although John refused to cooperate with the test, Dr. Altreuter completed a physicians examination report indicating an odor of alcohol on John's breath.
Wilcox stated that he called Findlay the next morning to discuss the events of the previous night, with Findlay merely replying "it's out of my hands."
On July 24, 1994, Inspector Horn concluded his investigation and found sufficient credible evidence to support the allegations of drug and alcohol abuse and lack of supervision/caretaker against Wilcox. Furthermore, Horn stated that he looked into the allegations by Wilcox but was unable to substantiate any of his claims. As a result, the report was "indicated" to be true with notification of this finding being sent to Wilcox in the form of a letter dated July 22, 1994 which Wilcox asserts he never received.
On July 25, 1995, Wilcox met with Bruce Rollins (Rollins), Personnel Coordinator for the Training Academy. Rollins informed Wilcox that the outcome of the CANTS investigation disqualified him from employment with DCYF. Wilcox was given the opportunity to resign but declined to do so and as a result, Wilcox was discharged from his employment with the department.
Wilcox appealed Inspector Horn's decision and his subsequent dismissal from DCYF's training program. Pursuant to DCYF regulations, Wilcox requested a hearing before the department's administrative hearing officer, Ms. Rosalie Bowen (Bowen). The hearing took place on December 7, 1995 at which Horn, Coleman, and Wilcox testified. Wilcox was represented by counsel throughout the proceedings and was permitted to examine all witnesses.
On December 18, 1995, Bowen delivered her decision. In a four page written memorandum, Bowen sustained the findings of Inspector Horn, having determined that the facts, which when viewed in light of the surrounding circumstances, would cause a reasonable person to believe that abuse and/or neglect had occurred. Bowen also denied plaintiff's application for attorney's fees. Therefrom, plaintiff filed the instant appeal to this Court.
On appeal, Wilcox essentially argues that: (1) the decision of hearing officer Bowen is erroneous as it is arbitrary, and "based upon totally unsubstantiated and unreliable evidence"; (2) the actions of DCYF violated his due process rights in that DCYF failed to give him adequate notice of the charges pending against him; and (3) that the unlawful actions of DCYF have barred him from obtaining any other employment opportunities in a social service field. DCYF maintains that there was credible evidence to support the findings and the procedure utilized throughout was in compliance with applicable rules and regulations. DCYF also argues that the instant appeal fails to meet any of the statutory requirements for judicial review and should be summarily denied and dismissed.
Standard of Review
The review of a decision of the Commission by this Court is controlled by R.I.G.L. § 42-35-15(g), which provides for review of a contested agency decision:
 (g) The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error or law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
This section precludes a reviewing court from substituting its judgment for that of the agency in regard to the credibility of witnesses or the weight of evidence concerning questions of fact. Costa v. Registry of Motor Vehicles, 543 A.2d 1307, 1309 (R.I. 1988); Carmody v. R.I. Conflict of Interest Commission,509 A.2d 453, 458 (R.I. 1986). Therefore, this Court's review is limited to determining whether substantial evidence exists to support the Commission's decision. Newport Shipyard v. RhodeIsland Commission for Human Rights, 484 A.2d 893 (R.I. 1984). "Substantial evidence" is that which a reasonable mind might accept to support a conclusion. Id. at 897. (quoting Caswell v.George Sherman Sand Gravel Co., 120 R.I. 1981, 424 A.2d 646, 647 (1981)). This is true even in cases where the court, after reviewing the certified record and evidence, might be inclined to view the evidence differently than the agency. Berberian v. Dept.of Employment Security, 414 A.2d 480, 482 (R.I. 1980). This Court will "reverse factual conclusions of administrative agencies only when they are totally devoid of competent evidentiary support in the record." Milardo v. Coastal Resources Management Council,434 A.2d 266, 272 (R.I. 1981). However, questions of law are not binding upon a reviewing court and may be freely reviewed to determine what the law is and its applicability to the facts.Carmody v. R.I. Conflicts of Interests Commission, 509 A.2d at 458. The Superior Court is required to uphold the agency's findings and conclusions if they are supported by competent evidence. Rhode Island Public Telecommunications Authority, etal. v. Rhode Island Labor Relations Board, et al., 650 A.2d 479, 485 (R.I. 1994).
The Agency Decision
Wilcox first argues that the decision is erroneous because it is based on totally unsubstantiated and unreliable evidence. Specifically, Wilcox argues: (1) DCYF failed to state what is meant by the term "indicated" or what standard is used in determining whether an allegation is indicated; (2) Horn and Coleman failed to follow up or investigate plaintiff's allegations such that the investigation and subsequent findings by DCYF are incomplete and inconclusive; and, (3) Hearing Officer Bowen failed to set forth specific findings of fact as required by statute. DCYF disagrees asserting: (1) the written decision clearly defines what is meant by an "indicated" finding; (2) Horn and Coleman had sufficient evidence from which they could substantiate a finding of lack of supervision/caretaker and drug or alcohol abuse against appellant; and, (3) the decision clearly sets forth specific findings of fact. Accordingly, DCYF maintains that this Court should affirm the department's decision.
Pursuant to its enabling legislation, DCYF is responsible for promotion, safeguard and protection of the social well being of the state's children. R.I.G.L. § 42-72-2. Consistent with this policy, the agency has promulgated rules and regulations which set forth the procedure to be followed and the standards to be utilized in investigating a report of alleged child abuse. See
R.I.G.L. § 42-72-5.
Upon receipt of a complaint concerning allegations of child abuse and/or neglect, DCYF regulations mandate that a Child Protective Investigator (CPI) be assigned to conduct an investigation of the charges. DCYF CANTS Policy No. 400. The CPI is required to respond to the complaint within twenty-four hours or earlier depending on response priority, i.e. whether the child is in imminent danger. Id. Once assigned, the CPI must determine the investigative level of each report. Each level is based on the specific child abuse and neglect allegations and on the degree of risk of harm to the child. DCYF CANTS Policy No. 411. The level assigned then dictates the minimum number of tasks which must be performed by the CPI in the course of the investigation. Cases involving drug/alcohol abuse and lack of caretaker supervision are considered level "2" investigations, requiring the investigator to
 "a. Interview each adult and child subject of the report (individually) within 24 hours. The initial visit with the family can be announced or unannounced.
 b. Interview all other children who are regular members of the household (individually or in a group.
 c. Contact the reporter, if identified, to secure additional information.
 d. Interview at least two other people who are believed to have firsthand knowledge of the incident, the injury, and/or the family's circumstances. One of these collateral contacts must be with a professional person."
DCYF CANTS Policy No. 413.
Upon conclusion of the investigation, the CPI must either "indicate" the report to be true or rule the allegations contained in the report are unfounded. In making this determination, the CPI is guided by DCYF CANTS Policy No. 420, which states in pertinent part:
 "I. POLICY
 The Department of Children, Youth and Families has the burden of proving that the allegations it brings against the parents/caretakers in all child abuse and neglect hearings and that they are liable under the law . . . . Standard of proof is a technical and legal term most often used to describe the quantity of proof and/or type of evidence needed in court proceedings . . . .
 II. PROCEDURE
 Standard of Proof to Indicate a Report is "credible evidence" which is defined as that collection of facts, which when viewed in light of surrounding circumstances, would cause a reasonable person to believe that abuse and/or neglect had occurred.
 1. The investigator must continually weigh the reliability of and ascribe importance to each piece of information received during the investigative process.
In the event the allegations are found to be indicated, the individual subject to the report may request a hearing to review the findings of the investigation. The Hearing Officer will immediately schedule a hearing date with the appellant. The appellant and/or his/her legal counsel will be afforded an opportunity prior to the hearing date to review a redacted copy of the CANTS decision in the Hearing Director's office. At the hearing, the appellant is afforded the opportunity to question the department personnel involved in the investigation and present testimony/evidence which would refute the contested findings. DCYF Policy on Non-Employee Related Administrative Hearings (September 1, 1993).
Upon completion of the hearing, the Hearing Officer must make a determination as to whether the findings are supported by credible evidence and whether the investigator complied with the requisite procedures and deliver a decision based upon the evidence presented at the hearing. The decision must set forth the issue, the relevant facts brought out at the hearing, the pertinent provisions of law and/or departmental policy and the reasoning which led to the decision which is to be based on clear and convincing evidence. A copy of the decision must then be forwarded to appellant and/or legal counsel. Id.
In the instant matter, evidence presented at the hearing indicated the initial call was placed with DCYF on July 13, 1995, at approximately 9:57 p.m. The next morning, at approximately 10:00 a.m., Horn and Coleman responded to East Main House and contacted all of the parties involved. Coleman interviewed the residents of the house while Horn interviewed the staff, John's girlfriend and mother, and Dr. Altreuter. Wilcox was subsequently interviewed on July 20, 1995. In so doing, Horn and Coleman complied with all department regulations regarding the investigation. Furthermore, based on the information received in the course of the investigation, e.g., the testimony of John, James, Souci, and Mary, Horn had sufficient evidence "which when viewed in light of surrounding circumstances would cause a reasonable person to believe that abuse and/or neglect had occurred."
Wilcox's claim that Horn and/or Coleman's failed to "follow-up's alternative theories is not supported by the evidence. All the individuals who had any information regarding the allegations were interviewed. Horn specifically stated that he looked into the allegations made by Wilcox but was unable to substantiate any of his claims. Whether they chose to believe one witness over another or whether they accepted one account of events and rejected another is a question of credibility. As previously stated, the Court is precluded from passing judgement with regard to the witnesses or the weight of evidence concerning questions of fact. See Costa, 543 A.2d 1307.
Likewise, Wilcox's arguments regarding the sufficiency of the written decision in its findings of fact and the failure of the department to clearly define what is meant by the term "indicated" are also without merit. Subsequent to the December 7, 1995 hearing, Bowen issued a four page decision in which she details both the procedural and factual travel of the case. Bowen also recites Wilcox's version of events and notes that she was present to observe all the witnesses present and noted the demeanor and consistency of their testimony. After applying the applicable standard of proof, which she also defined in her decision, Bowen concluded that there was credible evidence to support the findings of Horn. Accordingly, the decision is not deficient in its findings of fact. Rather, the Court finds it to be complete and in accord with all statutory requirements.
Due Process
Wilcox next argues that his due process rights were violated because DCYF's actions constitute unlawful procedure. Specifically, Wilcox argues that DCYF failed to provide him with proper and timely notice of the charges and subsequent findings, and when he did finally receive a notice from DCYF regarding the administrative hearing dated October 17, 1995, the correspondence did not constitute "reasonable notice" as required by statute. DCYF counters that Wilcox knew of the investigation from the moment he was asked to leave East Main House, with the opportunity to respond to the allegations in the July 20th interview as well as the December 7, 1995 hearing. With regard to the notice of the December 7, 1995 hearing, DCYF maintains the notice provided to Wilcox constitutes "reasonable notice" as it specified the dates, times, location and procedures relevant to the hearing.
It is well established that the due process requirements of a fair trial apply to procedures of administrative agencies.Bourque v. Dettore, 589 A.2d 815, 823 (R.I. 1991). Consistent with this requirement, an individual adversely affected by a decision of an agency is entitled to adequate notice of the hearing. Rhode Island General Laws § 42-35-9 sets forth the notice requirements for hearings arising under the Administrative Procedures Act. The statute states, in pertinent part:
 "(a) In any contested case, all parties shall be afforded an opportunity for hearing after reasonable notice.
 (b) The notice shall include:
 (1) A statement of the time, place, and nature of the hearing;
 (2) A statement of the legal authority and jurisdiction under which the hearing is to be held;
 (3) A reference to the particular sections of the statutes and rules involved;
 (4) A short and plain statement of the matters inserted. If the agency or other party is unable to state the matters in detail at the time of the notice is served, the initial notice may be limited to a statement of the issues involved and detailed statement shall be furnished.
These requirements are obviously intended to assure that a party is appraised of the nature of the hearing so that he can adequately prepare. Correia v. Norberg, 120 R.I. 487,391 A.2d 94, 98 (1978).
The facts presented in the instant matter demonstrate that Wilcox had notice of the charges against him from their inception. On July 13th, the date of the alleged incident, Wilcox was told by Christine Jones that he was to leave the premises because he was intoxicated. When he spoke with Findlay the next day, Findlay told him that it was "out of his hands." On July 20th, Wilcox spoke to inspector Horn in conjunction with the on-going CANTS investigation. On July 22, a notice was sent to Wilcox informing him that the allegations had been "indicated" against him. Furthermore, on July 24, 1995, Wilcox was informed by Bruce Rollins that the negative CANTS report precluded him from employment with DCYF and as a result, Wilcox was told that "he would not be able to continue his status as a trainee within the Division of Juvenile Correction Services of DCYF." Even assuming Wilcox did not receive the July 22, 1995 letter, it is clear that he had ample other notice of the charges pending against him.
With regard to the subsequent hearing, evidence presented indicates that on September 28, 1995, Wilcox received in response to requests from his counsel a letter from DCYF detailing the history of his case, indicating once again that he had been discharged from the training academy as a result of the indicated CANTS report arising from the incident at East Main House. This same letter also informed Wilcox that "Department policy provides for an administrative appeal of a decision of a CANTS investigator or inspector." The letter further detailed the procedure for availing oneself of the appellate process and instructed Wilcox to request a hearing from "the department's hearing officer, Rosalie Bowen."
On October 10, 1995, Wilcox sent a letter to Bowen requesting a hearing. In return, Wilcox received a letter indicating the hearing had been scheduled for December 7, 1995. The letter included the time and location of the meeting, instructed Wilcox that he was entitled to review the CANTS record prior to the hearing, and invited him to produce any witnesses on his behalf. This evidence of record indicates that Wilcox had more than the "reasonable notice" required by statute and was appraised at the nature of the hearing so that he could adequately prepare.
Therefore, because Wilcox was given notice and a hearing which comport with all due process requirements and because there is sufficient, credible, reliable evidence with which to support the CANTS report, this Court affirms the decision of the DCYF Hearing Officer and denies the appeal.
[1] This name, as well as the names of all other minors mentioned in this decision, is a fictitious name used to protect the identity of the minor.