DECISION
This is an appeal from a decision of the Coastal Resource Management Council (herein "CRMC"). The appellant seeks a remand of CRMC's decision granting an application for a residential boating facility in the Town of Warren, to the Warren Zoning Board and CRMC. Jurisdiction is pursuant to G.L. 1956 § 42-35-15. The appellant also seeks a declaratory judgment on the issue of validity of the Warren Zoning Ordinance provisions as related to the construction of docks. Jurisdiction is pursuant to G.L. 1956 § 42-35-7.
 Facts/Travel
Appellee Kirk Dexter filed an application with the Coastal Resources Management Council to construct and maintain a residential boating facility and to repair a stone and concrete sea wall at his residence located at 35 Shore Drive, Warren, Rhode Island. (CRMC Decision, 1); The subject water area is located in the Kickemuit River and is classified as a "Type 2 Low Intensity Use water area" (Id. at Fact 8). Residential docks are permitted in this type of water area[1] as are residential boating facilities, public launching ramps and structural shoreline protection facilities. (Id. at Fact 10)[2]
The facility, as originally proposed, consisted of a 4 foot wide by 78 foot long fixed timber pier with a ramp leading to an 8 by 16 terminal float. (Id. at Fact 1). On approximately July 25, 1995, defendant submitted revised plans to CRMC. (Id.). These plans as proposed by Dexter, consisted of a 72 foot fixed timber pier with an 8 foot ramp and a 16 foot long float. Also, the plan proposed the construction of approximately 6 feet of stairways leading to the water and to the paths connecting with the upland. (Id. at Fact 2). These stairways were to be located on the landward side of the dock. (Id.) The proposed facility, which was 102 feet in length, required a 12 foot variance from the standard outlined in CRMC Section 300.4.E.3.k (Id. at Fact 2, 11).
On May 4, 1995, CRMC requested public comment on the Dexter application. (Letter dated May 4, 1995). Objections were made by the Warren Conservation Commission (Letter dated June 1, 1995) and the Kickemuit River Council (Letter dated June 2, 1995). Both organizations requested that a hearing be held in the Town of Warren. Also, the Warren Harbor Committee requested Dexter's application be put on hold (Letter dated June 21, 1995). The committee expressed concern about the "number of boats in the Kickemuit" and requested time to conduct a "Kickmuit review." (Id.) Finally, the Warren Town Solicitor requested a hearing on this matter. (Letter dated June 21, 1995). The solicitor noted that "the Town's Building Official will issue a stop-work order on this project if construction is commenced." (Id.)
The CRMC heard the Dexter matter on June 27, 1995 and July 11, 1995. (CRMC Decision at 1). On August 8, the matter was referred to a subcommittee. A meeting was held on September 26, 1995, followed by workshops on November 16, 1995 and December 4, 1995. (Id.) On February 13, 1996, the entire council approved the Dexter application.
The appellant, the Town of Warren, timely appealed. The appellant argues that CRMC lacked jurisdiction to entertain the Dexter application. Specifically, appellant maintains that defendant was first required to obtain a special use permit in accordance with the Town of Warren Zoning Ordinance.[3] The appellant also contends that the agency's decision is not supported by substantial evidence and thus seek relief in accordance with G.L. 1956 § 42-35-15.
 Jurisdiction
The appellant contends that CRMC lacked jurisdiction to entertain the Dexter application as Dexter was first required to obtain a special use permit from the Town of Warren. The appellant claims that this zoning approval was requisite pursuant to the Zoning Enabling Act. G.L. 1956 Section 45-24-27 etseq. Alternatively, appellee argues that CRMC has exclusive jurisdiction over residential boating facilities.
In 1971 the Coastal Resource Management Council was created. The agency was endowed with the "primary responsibility" of "planning for and management of the resources of the state's coastal region." G.L. 1956 § 46-23-6. The Legislature, in recognizing that the "coastal resources of Rhode Island . . . are of immediate and potential value to the present and future development of this state," established a policy "to preserve, protect, develop, and, where possible, restore the coastal resources of the state." G.L. 1956 § 46-23-1. This grant of authority has been deemed "permissible" and in accordance with the Rhode Island Constitution. Milardo v. Coastal ResourcesManagement Council, 434 A.2d 266, 272 (1981).
The CRMC is bestowed with jurisdiction over land and water areas. Ratcliffe v. Coastal Resources Management Counsel,584 A.2d 1107, 1110 (R.I. 1991). The authority over land is however, limited. Section G.L. 1956 46-23-6(2)(B)(iii) provides
 "The authority of the council over land areas (those areas above the mean high water mark) shall be limited to two hundred feet (200') from the coastal physiographic feature or to that necessary to carry out effective management programs. This shall be limited to the authority to approve, modify, get conditions for, or reject the design, location, construction, alteration, and operation of specified activities or land uses when these are related to a water area under the agency's jurisdiction, regardless of their actual location. The council's authority over these land uses shall be limited to situations in which there is a reasonable probability of conflict with a plan or program for resources management or damage to the coastal environment."
With respect to the exercise of the above jurisdiction, our Supreme Court has recognized that CRMC was specifically given legislative authority to "issue permits for the erection of docking facilities." Wellington Hotel Associates v. Miner,543 A.2d 656, 658 (R.I. 1988) (citing G.L. 1956 46-23-6(B), as amended by P.L. 1984, ch. 244, Section 1); See also CRMC Section 300.4. Further, our Supreme Court has recognized CRMC's "broad discretion over coastline development . . . is imperative in light of the myriad of local ordinances that affect our coastal environment." Easton's Point v. Coastal Resource Mgt.,559 A.2d 633, 635 (R.I. 1989); Section 46-23-6(2)(ii)(A) of the General Laws provides
 "Any person, firm, or governmental agency proposing any development or operation within, above, or beneath the tidal water below the mean high water mark, extending out to the extent of the state's jurisdiction in the territorial sea shall be required to demonstrate that its proposal would not: (I) Conflict with any resource management plan or program adopted by the council; (II) Make any area unsuitable for any uses or activities to which it is allocated by a resource management plan or program adopted by the council; or (III) Significantly damage the environment of the coastal region."
Pursuant to § 46-23-6(3), one of CRMC's "powers and duties" is "coordination." In certain areas, such coordination, is mandated. CRMC Section 300.3 entitled Residential, Commercial, Industrial and Recreational Structures provides that "proposed activities [under this section] conform to the local zoning ordinance, or that if relief from an ordinance is required that it has been obtained and that the decision authorizing the appropriate relief is final." CRMC Section 300.3(c)(1). Alternatively, in CRMC Section 300.4 entitled Recreational Boating Facilities, there is no mention of prior zoning approval. What this section does require, in certain situations, is a permit from the Army Corp. of Engineers. CRMC, Section 300.4(1) (2).
The plain and clear language of the statute and the regulations promulgated pursuant to said statute indicates that CRMC possesses exclusive jurisdiction in the realm of Recreational Boating Facilities. Furthermore, this court is mindful that "administrative agencies defer to local municipalities for approval only by choice because as [our Supreme Court has] often stated, a state law of general application and character is superior to any inconsistent local or municipal ordinance." Easton, at 636 (citations omitted). Accordingly, this Court declares that CRMC has jurisdiction over residential boating facilities.
 Standard of Review
The review of a decision of the Commission by this Court is controlled by R.I.G.L § 42-35-15(g), which provides for review of a contested agency decision:
 "(g) The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."
This section precludes a reviewing court from substituting its judgment for that of the agency in regard to the credibility of witnesses or the weight of evidence concerning questions of fact.Costa v. Registry of Motor Vehicles, 543 A.2d 1307, 1309 (R.I. 1988); Carmody v. R.I. Conflict of Interest Commission,509 A.2d 453, 458 (R.I. 1986). This is true even in cases where the court, after reviewing the certified record and evidence, might be inclined to view the evidence differently than the agency.Berberian v. Dept. of Employment Security, 414 A.2d 480, 482 (R.I. 1980). This Court will "reverse factual conclusions of administrative agencies only when they are totally devoid of competent evidentiary support in the record." Milardo v. CoastalResources Management Council, 434 A.2d 266, 272 (R.I. 1981). However, questions of law are not binding upon a reviewing court and may be freely reviewed to determine what the law is and its applicability to the facts. Carmody v. R.I. Conflicts ofInterests Commission, 509 A.2d at 458. The Superior Court's role is to examine whether any competent evidence exists in the record to support the agency's findings. Rocha v. Public Util.Comm'n., No. 96-112-M.P., Slip Op. at 7 (R.I., filed June 9, 1997). The Superior Court is required to uphold the agency's findings and conclusions if they are supported by competent evidence. Rhode Island Public Telecommunications Authority etal. v. Rhode Island Labor Relations Board, et al., 650 A.2d 479, 485 (R.I. 1994).
 The Agency's Decision
Additionally, appellant argues that CRMC should not have granted the Dexter application as the record is not supported by substantial evidence and does not conform with the policies and programs of CRMC. Appellant specifically argues that with respect to the dock assent, the record is not clear as to the location of mean high tide (herein "MHW") and mean low tide (herein "MLW") lines.
The CRMC must comply with requirements of the Rhode Island Administrative Procedures Act (RIAPA). Ratcliffe, 584 A.2d at 1111; Sakonnet Rogers Inc. v. Coastal Resources ManagementCouncil, 536 A.2d 893, 896 (R.I. 1988). RIAPA states:
 "Any final order shall include findings of fact and conclusions of law, separately stated. Findings of fact, if set forth in statutory language, shall be accompanied by a concise and explicit statement of the underlying facts supporting the findings." G.L. 1956 Section 42-35-12.
Section 300.4.E.3.k of the CRMC provides that "Residential boating facilities shall not extend beyond that point which is (I) 25 percent of the distance to the opposite shore (measured from the mean low water of (2) 50 feet seaward of mean low water, whichever is lesser." Accordingly, the location of Mean Low Water will impact the amount of variance required from Section CRMP 300.4.E.3.k.
The record reveals that Mr. Medeiros, CRMC Staff Engineer, stated the importance of, and his disappointment with, the MLW readings.
 "Some of the measurements that are required — I mean, first of all, I'll be honest with you, I'm disappointed to hear Mr. Yoder say that the initial plan that came in here didn't have the correct measurements on it, because, and it's quite clear in the program, that when you design a dock, that the critical dimensions are the distance past mean low water and some of these other marks . . . ." (September 26, 1995, Tr. at 38).
With respect to the location of the MLW and MHW, Mr. Yoder, a registered professional engineer, certified that his measurements were accurate (September 26, 1995, Tr. at 91). However, Mr. Yoder, when questioned by council member, Mr. Beattie, also testified that Mr. Dexter, not he, was the person who performed the measurements:
 "Mr. Beattie: the only thing I got, is I'm confused, as the gentleman has said and she has said, that on this mean high water and mean low water. My understanding is, Mr. Yoder, that you went out and Mr. Dexter went out and measured the ground and told you what it was, or measured the depths?
 Mr. Yoder: Yes, I instructed him to measure at, I don't remember the interval, 20-foot intervals out from the seawall, measure the distance and measure it at the two times, at the low tide, based on the charts or the information given by the Weather Bureau and at high tide, he recorded those and forwarded them to me and those are the basis of my use, and I could, you know, we have copies of those readings at the distances, they were at ten-foot intervals out to 60 feet, out to a hundred and into 60 so there are five measurements at two different times and they were taken on 7/10/95.
 Mr. Beattie: Okay
 Chairman Tikoian: Mr. Yoder, you're certifying that those are correct?
 Mr. Yoder: To the best of my knowledge, they are correct, and they would be what I would expect them to be, yes. (September 26, 1995, Tr. at 90-1)."
Mr. Medeiros at one point questioned the accuracy of the MLW measurements; however, Medeiros later testified he "truste[ed]" Mr. Yoder's measurements of the site (September 26, 1995, Tr. at 30, 38). The record seems confused at best with respect to these readings, especially the critical MLW readings:
 "Mr. Medeiros: So there's two of them, so there's some confusion on here. On the one that was initially submitted for review, the mean low water was shown to be 22 feet from the seawall. On the recent revision, that Mr. Yoder can explain I guess, is the mean low water is shown to be 35 feet from the face of the wall, so, and, you know, I guess the first plan has been superseded, so if we go, we're using, the applicant is representing that the mean low water is 35 feet from the seawall." (September 26, 1995, Tr. at 21-2).
At the end of the hearing Mr. Beattie requested that the MLW and MHW readings be clarified.
 "Mr. Beattie: I would just request that after the workshop we clarify mean high water and mean low water. I would feel much better, and if they want me to, I'll go with them, or I'll send somebody with them, and I would like the staff to go out there and make those measurements at mean high water and mean low water." (September 26, 1995, Tr. at 97).
The record demonstrates, however, that these readings were never clarified, not even on February 13, 1996 when the Dexter application was approved. (February 13, 1996, Tr. at 60).
After a review of the entire record, this Court finds that the agency decision is based on findings which are not supported by reliable, probative, and substantial evidence of the record. Accordingly, this case is remanded to CRMC for findings of fact with respect to the issue of MHW and MLW marks. This court need not address the appellant's additional arguments at this time. This Court also declares that CRMC possessed jurisdiction over the instant application.
Counsel shall submit the appropriate judgment for entry.
[1] CRMP Section 200.2.B.1.
[2] CRMP 200.2.C.3.
[3] See Town of Warren Zoning Ordinance Section 32-54 requiring a special use permit for the construction of a "Boat dock or marina, ship dock or marina."