DECISION
Before this Court is plaintiffs' appeal from a decision of the Rhode Island Department of Human Services (DHS), finding plaintiffs had received recoverable overpayments in its workers compensation per diem costs for the period from January 1, 1992 through June 30, 1994. Jurisdiction is pursuant to G.L. s42-35-15.
 Facts/Travel
Plaintiff, Coventry Health Center Continuum (Center) is a duly organized Rhode Island corporation. The center owns Coventry Health Center (Facility), a nursing home situated in Coventry, Rhode Island. Plaintiff, Health Management Services[1] is a duly organized Rhode Island corporation which serves as the managing agent for the Center. Defendant Christine Ferguson is named in her capacity as the Director of DHS.
By letter dated January 16, 1991, the Center appealed its Medicaid rate of reimbursement for workers compensation and health insurance, retroactive to October 1, 1990,[2] due to increases in such costs at the Facility. (Agency Exhibit 10.) In its letter, the Center noted its belief that it would be allowed to use its 1990 calendar year Form BM-64[3] in order to prove that its workers compensation and health insurance premiums had increased at a rate which exceeded the published inflation factor. Id.
In its letter dated May 23, 1991, DHS's Rate Setting and Auditing Unit (Unit) approved an increase from $85.97 to $92.77 as the facility's per diem rate of reimbursement. (Agency Exhibit 11.) This increase, effective May 1, 1991 and retroactive to October 1, 1990, was made in consideration of increases in the facility's Health and Workmans Compensation Insurance, as well as an adjustment to the OBRA '87 Cost Center. Id. The May 23, 1991 letter, and its six pages of attachments, contained the following language:
 "Final Settlement for the Workman's Compensation portion of this appeal will be based on the audit of the policy for the period October 1, 1990 to December 31, 1990. When this audit is complete, please forward that information to this office. The Rate Setting and Auditing Unit reserves the right to field audit this appeal at the time of the 1989 Field Audit." Id.
 . . .
 "Interim settlement on behalf of the Rhode Island Medical Assistance Program, Title XIX, Medicaid, covering the period form October 1, 1990 through April 30, 1991. Interim settlement is based upon the Appeal procedures contained within the Principles of Reimbursement for Nursing Facilities. Final Settlement will be based upon audit of the pertinent financial data involved with the Appeal process and/or base period." Id. at pg. 6 attachments.
The interim settlement for January 1, 1991 to April 30, 1991 was $205,298.80. Id. The settlement for the time period between October 1, 1990 to December 31, 1990 was $160,319.16.[4]
The DHS sent the facility a letter dated April 9, 1992. This letter, which referenced DHS's May 23, 1991 letter, contained the following language:
 "As stated in my letter dated May 23, 1991 final settlement for the Worker's Compensation portion of this appeal will be based on the audit of the policy in effect during the appeal period. Now that this audit has been completed and the audited premium has been determined settlement has to be made.
 . . .
 It should be noted that the settlement is only through May 31, 1991. This was done because a new insurance policy went into effect as of June 1, 1991. The Worker's Compensation rate generated from this policy justifies the rate being paid per the appeal." (Agency Exhibit 20.)
According to this letter, the Facility owed the Rhode Island Medical Assistance Program a settlement in the amount of $170,463.54 for workers compensation overpayments. Id. This settlement, which was later reduced to $158,544.84, was for the time period between October 1, 1990 through May 31, 1991. (Agency Exhibits 20, 21.)
The next correspondence in this case was a letter dated August 11, 1992, in which the facility was provided with the field audit results[5] of their BM-64 Cost Report for the base year and calendar year — 1989. (Agency Exhibit 22.) The letter, which indicated that there were several adjustments to the facility's reported costs, provided the facility with the opportunity to schedule an exit audit conference. Id. The Field audit noted that the 1989 BM-64 Cost Report, as audited, would be used to establish the final prospective rate of reimbursement, effective October 1, 1990, for a variety of cost centers. One of these cost centers included Labor and Payroll Related Expenses.Id. at 2.
Next in the array of correspondence was a letter dated January 11, 1993, by which the Unit advised all Title XIX Medicaid Program participating Nursing Facilities, including Coventry Health Center, that it would be reviewing all of its previously granted appeals. (Agency Exhibit 23.) According to the letter, this review included issues involving increases in workers compensation insurance.[6] Id. In compliance with the letter, each facility was required to notify the Unit if the notice was applicable to the individual facility. This was so that the Unit could calculate a settlement and institute a rate reduction. Id. Believing that the Worker's Compensation matter had been resolved prior to its receiving the January letter, the facility did not notify the Unit of any decreases in its Worker's Compensation Costs.
The Unit learned of the Worker's Compensation overpayments when it visited the facility in 1994 on an unrelated matter. (Agency Decision Dated May 23, 1997 at 5.) By letter dated August 3, 1995, the Unit notified the Center it would be making an adjustment to the Facilities Worker's Compensation rate. (Agency Exhibit 24.)
Per the Center's request, a review conference was held on June 12, 1996. This conference was to review the Unit's adjustment to the Facilities Worker's compensation costs for the period January 1, 1992 through June 30, 1994. (Agency Exhibit 28.) In a decision dated July 8, 1996 (First Decision), DHS's Division of Medical Services upheld the Unit's adjustments to the Facilities Worker's Compensation costs. The Center then appealed to DHS's Appeals Office. Hearings were held on or about November 21, 1996, December 16, 1996, February 28, 1997, and March 20, 1997. By decision dated May 23, 1997, the Appeals Office affirmed the first decision allowing the adjustment to the Facilities Worker's Compensation costs.
Plaintiff has timely appealed and is now before this Court. Plaintiffs argue that defendant is estopped from revisiting the results of the appeal audit and, in the alternative, that the Principles of Reimbursement for Nursing Facilities (Principles) preclude DHS from revisiting the results of a completed appeal.
 Standard of Review
The review of a decision of the Commission by this Court is controlled by R.I.G.L § 42-35-15 (g), which provides for review of a contested agency decision:
 "(g) The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 "(1) In violation of constitutional or statutory provisions;
 "(2) In excess of the statutory authority of the agency;
 "(3) Made upon unlawful procedure;
 "(4) Affected by other error of law;
 "(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 "(6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."
This section precludes a reviewing court from substituting its judgment for that of the agency in regard to the credibility of witnesses or the weight of evidence concerning questions of fact. Costa v. Registry of Motor Vehicles, 543 A.2d 1307, 1309 (R.I. 1988); Carmody v. R.I. Conflict of Interest Commission,509 A.2d 453, 458 (R.I. 1986). This is true even in cases where the court, after reviewing the certified record and evidence, might be inclined to view the evidence differently than the agency.Berberian v. Dept. of Employment Security, 414 A.2d 480, 482 (R.I. 1980). This Court will "reverse factual conclusions of administrative agencies only when they are totally devoid of competent evidentiary support in the record." Milardo v. CoastalResources Management Council, 434 A.2d 266, 272 (R.I. 1981). However, questions of law are not binding upon a reviewing court and may be freely reviewed to determine what the law is and its applicability to the facts. Carmody v. R.I. Conflicts ofInterests Commission, 509 A.2d at 458. The Superior Court's role is to examine whether any competent evidence exists in the record to support the agency's findings. Rocha v. Public Util. Comm'n.,
No. 96-112-M.P., Slip Op. at 7 (R.I., filed June 9, 1997). The Superior Court is required to uphold the agency's findings and conclusions if they are supported by competent evidence. RhodeIsland Public Telecommunications Authority, et al. v. RhodeIsland Labor Relations Board, et al., 650 A.2d 479, 485 (R.I. 1994).
 The Principles
Plaintiffs argue that the Principles, which are prospective in nature, preclude DHS from revisiting the results of a completed appeal. The crux of Plaintiffs' argument is prefaced on the notion, that in this case, the audit of plaintiffs' appeal had previously been completed on or before August 11, 1992.
The Principles of Reimbursement for Nursing Facilities,[7]
operate on a prospective system.
 "It should be noted that commencing with the 1978 calendar year, the Rhode Island Medical Assistance Program began to make payment to participating facilities on a prospective basis. Starting with the calendar year 1982 and each subsequent year a per diem rate for each participating facility was established prior to January 1 to be effective January 1 of each year for all services provided during that year." (Agency Exhibit 29 at ii.)
Once a facility's per diem reimbursement rate is established, that rate represents the full and total payment for services that are provided.[8] That is, of course, subject to changes that may occur as a consequence of an audit of the facility's base year. Id.
Once a facility's individual prospective rate is determined, (See Agency Exhibit 29 at 10-12, "Method of Determining Individual Prospective Rates, ") the Principles provide a means by which DHS can, in certain circumstances, grant a "prospective rate that reflects demonstrated cost increases in excess of the rate that has been established by the application of the percentage increase." Id. at 12. A facility may qualify for a rate increment increase if it can demonstrate "significant increases in Worker Compensation and/or Health Insurance premiums which cannot be accommodated within the facility's assigned aggregate per diem rate . . ., if cost justified, so long as the new assigned per diem rate in the Labor and Payroll Related Expenses cost center does not exceed two-percent (2%) of said cost ceiling." Id. at 13.
In its thirteen page decision, the agency concluded that the appeals process was on-going and that the Unit had based its Workers Compensation per diem figures on estimated figures. (Agency Decision Dated May 23, 1997 at 11-12.) The record evidences a variety of correspondence between the parties. This includes a letter dated January 16, 1991 in which the Center requested an appeal of its Worker's Compensation rate of reimbursement. (Agency Exhibit 10.) This appeal, triggered a review by the Unit and ultimately resulted in approximately $365,000 worth of payments being made to the Center. It is not disputed that the Unit was entitled to conduct an audit pursuant to its granting of the Center's Appeal.
The record further evidences another letter, dated April 9, 1992, which informed the Center that final settlement needed to be made for the Worker's Compensation portion of this appeal. (Agency Exhibit 20.) This settlement, as stated by the April 9, 1992 letter and by Joseph Durand, DHS Rate Setting Unit, pertained only to the time period through May 31, 1991. This is because the Worker's Compensation policy that went into effect as of June 1, 1991 was an estimated policy:
 "Um, included in the April 9th letter was, uh, uh, paragraphs that Mr. Avanzato has already re- referred to. Also, if you could refer to paragraph number three? It states: `It should be noted that the settlement is only through May 31st 1991'. This was done because a new insurance policy went into effect as of June 1st, 1991. The workers' compensa — compensation rate generated from this policy justifies the rate being paid for that appeal. The workers' compensation policy that goes into effect as of June 1st is an estimated policy, It is not actual cost. Um, what originated this, the, all of these, this whole appeal from the facility was an estimated workers' comp policy. That worker, estimated worker' comp policy generated the $365,000.00 that was originally paid to the facility. Once it was determined what the actual costs were, uh, $158,000.00 was recouped. Um, the the rate that went from October of 1990 through December of 1990, the actual appeal period, is $4.47, which I stated before. Effective June 1st of 1991, the rate is much higher than that. That rate was continued to be paid to the facility, even though it was an estimated, we were waiting for actual costs to be, uh, to be determined. Uh, the $6.73, that's what it ended up being. I'm not exactly sure what it was originally. That continued to be paid to the facility until such a time as as this whole issue, uh, came to light. It, that amount represents an estimated premium . . . . (Tr. 11/21/96, pg. 21)
See also Tr. 11/21/96, p. 37; Tr. 12/16/96 p. 43.
Finally, the record contains a copy of the Unit's 1992 Field Audit and letter dated August 11, 1992. (Agency Exhibit 22.) According to Mr. Durand, the worker's compensation figures contained in the Field Audit were estimates and not final figures.[9] Tr. 12/16/96, p. 53.
The correspondence along with the testimony of Mr. Durand, evidences that the audit of the appeal had not been previously completed on or before August 11, 1992. As such, the agencies decision is supported by reliable, probative and substantial evidence of the record.
 Estoppel
Plaintiffs argue that DHS is estopped from revisiting the results of the appeal. Plaintiffs contend that DHS through its representations, omissions, actions, and inactions, led the Center to reasonably believe that the workers' compensation appeal was completely resolved and not subject to any further audit.
The doctrine of estoppel is rooted in equity. This type of relief is "extraordinary and will not be applied unless the equities clearly must be balanced in favor of the parties seeking relief under this doctrine." Greenwich Bay Yacht Basin Assoc. v.Brown, 537 A.2d 988, 991 (R.I. 1988); See also Ocean RoadPartners v. State, 612 A.2d 1107, 1111 (R.I. 1992). Equitable estoppel can be used against private parties as well as governmental authorities. Greenwich Bay, 537 A.2d at 991. Where justice requires, this doctrine may also be applied against administrative agencies and municipal authorities. Id. at 991 (citing Loiselle v. City of East Providence, 116 R.I. 585,359 A.2d 345 (1976); Schiavulli v. School Committee of NorthProvidence, 114 R.I. 443, 334 A.2d 416 (1975); Ferrelli v.Department of Employment Security, 106 R.I. 588, 261 A.2d 906
(1970)).
As defined by our state Supreme Court,
 "the indispensable elements of equitable estoppel, or estoppel in pais, are: `first, an affirmative representation or equivalent conduct on the part of the person against whom the estoppel is claimed which is directed to another for the purpose of inducing the other to act or fail to act in reliance thereon; and secondly, that such representation or conduct did induce the other to act or fail to act to his injury.'" Providence Teachers Union v. School Bd., 689 A.2d 388 (R.I. 1997) (quoting Lichtenstein v. Parness, 81 R.I. 135, 138, 99 A.2d 3, 5 (1953)).
See e.g., Greenwich Bay, 537 A.2d at 990-92 (if proven, allegations set forth in complaint and affidavit asserting CRMC had assured plaintiffs their application would be judged in accordance with earlier program regulations, would warrant application of equitable estoppel). "The key element of an estoppel is intentionally induced prejudicial reliance." E.Greenwich Yacht Club v. Coastal Res. Mgt. Council, 118 R.I. 559, 568, 376 A.2d 682 (R.I. 1977) (citing Raymond v. B.I.F.Industries. Inc., 112 R.I. 192, 198-99, 308 A.2d 820, 823 (1973). Although mere non action is generally insufficient to warrant application of this doctrine, Ferrelli, 261 A.2d at 909, silence can form the basis of estoppel if"there exists a duty not to remain silent as where the circumstances require one to speak lest such silence would reasonably mislead another to rely thereon to his detriment." Schiavulli, 334 A.2d at 419 (citation omitted) (estoppel applied to prevent a school committee from denying that a teacher's absence was the result of her being on a leave of absence where the school superintendent told teacher he would convey her request for leave of absence and the committee failed to act). See also Murphy v. Duffy, 46 R.I. 210, 124 A. 103
(R.I. 1924) (estoppel applicable to prevent town from asserting school was being constructed at a location which had not been approved by town school committee where school committee acquiesced to work which contractor was doing).
In his decision, the Appeals Officer found that the doctrine of estoppel did not apply to the case at bar. (Agency Decision Dated May 23, 1997 at 12.):
 "I have also concluded that no evidence was received which would demonstrate that the Unit notified the facility anytime prior to 1995 that the Workers' Compensation appeal process had ended. The arguments relative to estoppel put forth by the parties have been considered. In the matter at hearing, I can find no evidence that the Agency representatives, by their actions or inactions, caused the facility to rely on the Unit to its detriment. Rather, I find that the facility, through a misunderstanding of the wording on certain of the communications from the Agency, mistakenly chose a course of conduct which resulted in significant monies being owed to the Department by the facility." Id.
As such, the Officer concluded that the facility was not entitled to retain the overpayments it had received for Worker's Compensation costs.
As noted above, the record contains the following: (1) a letter dated April 9, 1992 informing the facility that final settlement needed to be made for the workers compensation portion of the appeal for the time period between October 1, 1990 through May 31, 1991, and (2) a copy of the Unit's 1992 Field Audit containing estimate worker's compensation figures. See Tr. 12/16/96, p. 53. These findings support the agency's conclusion that there existed a misunderstanding which did not rise to the level of an affirmative representation. Further, neither the record below nor any information currently before this court establishes any reliance to the detriment of the facility from any of the agency's statements or correspondence.
After a review of the entire record this Court finds that the agency's decision, finding plaintiffs had received recoverable overpayments in its workers compensation per diem costs for the period from January 1, 1992 through June 30, 1994, (i) is not in excess of the statutory authority of the agency, (ii) supported by substantial, reliable, and probative evidence of record, and (iii) not affected by an error of law. Substantial rights of the plaintiffs have not been prejudiced.
Counsel shall submit an appropriate order for entry.
[1] Throughout the decision, plaintiffs Coventry Health Center Continuum and Health Management Services will be referred to collectively as the "Center."
[2] The initial appeal period of time was October 1, 1990 through December 31, 1990.
[3] A BM-64 is an annual cost report.
[4] The record indicates that a second appeal was filed by letter dated September 3, 1991. Agency Exhibit 12. This appeal requested an increase in the facility's per diem rate of reimbursement retroactive to June 1, 1991. A review of the record indicates that this appeal was subsequently dropped. See May 23, 1997 Decision at 3; (Agency Exhibit 12.)
[5] By letter dated January 28, 1992, DHS informed the facility that it would be conducting a field audit for the 1989 calendar year beginning on January 30, 1992. (Agency Exhibit 13.)
[6] "Such appeals include, but would not be limited to increases in Workers' Compensation Insurance. If the facility has realized a decrease in Workers' Compensation Costs subsequent to the appeal period then the Rate Setting and Auditing Unit will be calculating a settlement and a rate reduction." (Agency Exhibit 23.)
[7] At the November 21, 1996 hearing, the parties agreed to use the Principles dated October 1, 1990. See Tr. 11/21/96, p. 5-6. Also, DHS used the Principles dated October 1, 1990 in its May 23, 1997 decision. Although this Court cites to the provisions of the Principles effective October 1, 1990, it notes the fact that the Principles have since been modified. The portions of the Principles which this Court finds pertinent to this appeal were not altered in such a way so as to affect the outcome of this case. See e.g., 21 CRIR 15 040 015 (1997).
[8] Thus if a facility is cost efficient, it is entitled to retain the difference between its actual per diem cost and the per diem rate which has been determined by the Rhode Island Medical Assistance program.
[9] Plaintiffs' argument that Mr. Durand has no personal knowledge of the audit has no merit. See Reply Brief of Plaintiffs Dated January 15, 1998 at 3. See also Brief of Plaintiffs Dated November 3, 1997 at 23. ("Mr. Durand had no personal knowledge of any material facts, and reviewing documentation in connection with the Center's appeal would have provided him hearsay, not personal, knowledge.") Plaintiffs Brief Dated January 15, 1998 at 3, fn. 1. In making this statement this Court is mindful of the Rhode Island Supreme Court's decision inDePasquale v. Harrington, 599 A.2d 314 (R.I. 1991), wherein the Court recognized the admissibility of hearsay evidence in an administrative hearing:
 "The admission of hearsay evidence in an administrative forum is reflective of the traditional division of function between judge and jury. Many of the rules surrounding the exclusion of hearsay in jury trials are meant to prevent juries, uninitiated in the evaluation of evidence, from hearing unreliable or confusing testimony and rendering a verdict on such evidence. See McCormick on Evidence §§ 351-352 at 1006-12. Such protection is far less necessary when evidence is presented to a judge sitting without a jury or, as in this case, a hearing officer with substantial expertise in the matters falling within his or her agency's jurisdiction." Id. at 316.