DECISION
This is an appeal from a decision of the State Department of Human Services Appeals Office (Hearing Officer.) Plaintiff seeks reversal of the Hearing Officer's determination of the countable rental income available to her with respect to property she owns jointly with her daughter. Jurisdiction in this Court is pursuant to R.I.G.L. 1956 §42-35-15.
 Facts/Travel
Plaintiff, Claire Coutu (Coutu) is and has been eligible to receive benefits under the Medical Assistance Program administered by the Department of Human Services (DHS). Coutu and her daughter, Jacqueline Cavaco (Cavaco), are joint owners of a three family residential building located at 31 Mill Street, West Warwick, Rhode Island. Each owner has an undivided one-half interest in the real estate. (Tr. at 27, 28.) The second floor tenant pays eighty ($80.00) dollars a week rent, and the third floor tenant pays one hundred ($100.00) dollars a week rent. (Tr. at 10.) Cavaco and her husband live in the first floor apartment and pay no rent.
Coutu has resided in the West View Nursing Home since 1995. When she entered the nursing home, Coutu and her husband were living in the two bedroom first floor apartment. (Tr. at 9.) Cavaco was then living in the third floor unit and was paying rent to her parents, who then jointly owned the property. (Tr. at 9.) After her father's death in 1998, Cavaco moved to the first floor apartment anticipating that her mother might be released from the nursing home. Cavaco felt that it would be easier for her mother to return to her own first floor apartment rather than to move in with Cavaco on the third floor. Cavaco apparently believed that if her mother was released from the nursing home that she would not be able to live alone but would have to share an apartment with Cavaco. (Tr. at 28, 30.)
At all times material hereto, Coutu was receiving Medicaid benefits. As part of a re-certification process, in September, 2000, DHS reviewed the amount of income that was generated by the property located at 31 Mills Street. (Tr. at 9.) DHS spent several months gathering documents verifying the rental income and the expenses on the property. (Tr. at 10.) They completed the post-eligibility review and notified Coutu on January 11, 2001 of their determination. (Tr. at 3, 9.) DHS advised Coutu that based upon their calculations of her gross income and allowable deductions, she would be responsible for paying a share of her medical expenses.
In making that determination, the agency concluded that the third floor unit was "[t]he intent to return unit. The unit that she vacated." (Tr. at 11.) An "intent to return home unit" remains an exempt asset and is excluded as a resource. (Tr. at 14.) However, Coutu vacated the first floor unit when she entered the nursing home. There is no evidence that Coutu ever resided in the third floor apartment. After Cavaco moved from the third to the first floor, she rented the third floor unit to a tenant for $100.00 a week. (Tr. at 10, 11.)
After determining that Coutu had "vacated" the third floor unit, the agency reasoned that since the "return home unit" was rented, any rents received from the rental should be calculated as income to Coutu and should not be split between Plaintiff and her daughter. (Tr. at 11.) Lynn Bert, supervising Eligibility Technician, testified:
 "So then we totaled up the rental income. From the rental income, we deducted one half the total expenses on the property. The taxes and — expenses being the taxes, the insurance, the water and the sewer. There are three units. One and a half units' income was attributed to Claire and half the expenses for the total property were deducted from that." (Tr. at 11.)
When questioned as to why she had determined that the third floor apartment was the "return home unit", Bert explained that "[i]t was the only available unit. One unit was rented since 1950. The other unit was owner occupied." (Tr. at 12.) Bert decided that since the third floor tenant was neither a co-owner nor a long term tenant, the apartment would be available to Coutu if she returned home. The second floor tenants had occupied their unit for many years.
Bert attributed 50% of the eighty ($80.00) dollars a week rent for the second floor unit to Coutu and 50% to her daughter. Bert did not consider the first floor apartment as the "return home unit" because it was owner occupied by the co-owner, Cavaco. (Tr. at 12.) Bert determined that each co-owner was responsible for 50% of the expenses incurred in maintaining the building, including taxes, insurance, water and sewer fees. (Tr. at 11.)
On January 11, 2001, DHS issued a notice advising Plaintiff of the amount of rental income it attributed to her. (DHS Letter, January 11, 2001.) On February 27, 2001, DHS issued a second notice reflecting an increase in RFDI and an increase in two State pensions. (DHS Letter, February 27, 2001.)
In pertinent part, the February 27, 2001 letter stated:
 "Medical Assistance eligibility has been evaluated based on the most current information provided. This notification is to advise that Medical Assistance coverage remains the same . . . This letter is to inform you that you are responsible to pay a share of your medical expenses (R.I. DHS MANUAL, Section 0392.05). This money is payable to your health care provider, such as the nursing home . . . Your share of the medical expenses is due monthly on the gross income and allowable deductions reported to us . . . Your share of the medical expenses for January 02, 3002 is $1679.72. Gross income: + 1894.18 Personal needs deduction (standard) — 50.00 Medical insurance premiums 1679.92 . . ." (DHS Letter, February 27, 2001.)
Coutu disagreed with that determination and requested a hearing. (Request for Hearing, March 5, 2001.)
Plaintiff's appeal was heard before a single Hearing Officer on May 15, 2001. Bert and Cavaco testified at the hearing. The Hearing Officer indicated that he was not interested in hearing testimony from Cavaco that the first floor apartment was the "return home unit". The Hearing Officer stated, "I don't care which apartment is which. Just tell me when you rented that apartment." (the third floor apartment Cavaco had vacated when she moved to the first floor after her father's death.) (Tr. at 14.)
The Hearing Officer accepted the agency's determination that the Coutu was entitled to all of the rentals generated by one of the apartments. He explained to Cavaco:
 "Okay. I would suggest to you (Cavaco) that the property you live in of course — the apartment you live in has a value. Okay. And so that it would appear, on the surface before I review any policy, that you have three units, and you're half owner of the property. One unit you live in, that's one. Then you would be entitled to half of one of the other two units. And your mother's income would be one unit plus that other half . . ." (Tr. at 36.)
After her mother entered the nursing home, Cavaco became the co-owner of the property with Coutu. After her father's death, Cavaco moved into the apartment previously occupied by her parents, who had occupied it as co-owners. (Tr. at 7, 8.) Cavaco claims that the first floor unit should be considered the "return home unit" because it was the unit her mother vacated, and because she expected to share that apartment with her mother in the event that Coutu returned from the nursing home. If the first floor unit was the "return home unit", then both Coutu and Cavaco would share equally the rent for the second and third floors, and the first floor apartment would be exempt from resources as the "return home unit".
In a written decision issued on May 18, 2001, the Appeals Office denied Plaintiff's appeal in part. The Officer made the following findings of fact:
 1. The appellant currently resides in a nursing facility.
 2. The appellant is in receipt of Medical Assistance Long Term Care benefits.
 3. The appellant is required to contribute to her cost of care.
 4. The appellant has a ownership in rental property.
 5. The appellant is entitled to receive gross rental income of $585.
 6. The appellant is entitled to income deductions of $177.50 per month.
 7. Net rental income to the appellant is $407.50 monthly. The appellant is required to apply this income to the cost of her care.
 8. The appellant requested a hearing in a timely manner.
 CONCLUSION: There is no disagreement with regard to the property situation and the income generated by the property. The appellant maintains a ownership in the property, and her daughter maintains the other ownership, as well as residing in one of the three rental units. The rental income for the other two units are $80-weekly, and $100-weekly. First, a value must be placed on the owner occupied rental unit. Based on the rental received in the other two units a reasonable value would be $90-weekly. Thus, the gross rental income equals $270-per month. With each co-owner receiving of the rental income, the appellant is entitled to gross rental income of $135-weekly, or, $585-monthly.
 There is no disagreement with regard to the taxes, insurance, water and sewer fees, which total $459.98 annually. With each co-owner responsible for of said expense, the monthly expense to the appellant is $177.50. This leaves a net monthly rental income to the appellant of $407.50 . . .
 Review of section 0388.20 . . . is quite clear. Rental income, when the property is not the client's home is countable . . . The agency has clearly applied the policy correctly by counting both the income and the appropriate deductions to same.
 Only the consistency of the mathematics is in question. The agency chose to count the more valuable unit income to the appellant, and of the lower rental valuation, yet counted of the deductions. This method is inconsistent. The agency should have averaged the income and split it, just as they have done with the expenses. Therefore, the agency is to recompute the appellant's gross and net rental income (Administrative Hearing Decision, May 18, 2001.)
It is from this decision that Plaintiff takes her appeal.
 Standard of Review
The review of a decision of the Department of Human Services by this Court is controlled by R.I.G.L. § 42-35-15(g), which provides for review of a contested agency decision:
 (g) The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error or law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
This section precludes a reviewing court from substituting its judgment for that of the agency in regard to the credibility of witnesses or the weight of evidence concerning questions of fact. Costa v. Registry of Motor Vehicles, 543 A.2d 1307, 1309 (R.I. 1998); Carmody v. R.I. Conflict of Interest Commission, 509 A.2d 453, 458 (R.I. 1986). Therefore, this Court's review is limited to determining whether substantial evidence exists to support the agency's finding. Newport Shipyard v. Rhode Island Commission for Human Rights, 484 A.2d 893 (R.I. 1984). "Substantial evidence" is that which a reasonable mind might accept to support a conclusion. Id. at 897. (quoting, Caswell v. George Sherman Sand Gravel Co., 120 R.I. 1981, 424 A.2d 646, 647 (1981)). This is true even in cases where the court, after reviewing the certified record and evidence, might be inclined to view the evidence differently than the agency. Berbarian v. Dept. of Employment Security, 414 A.2d 480, 482 (R.I. 1980). This Court will "reverse factual conclusions of administrative agencies only when they are totally devoid of competent evidentiary support in the record." Milardo v. Coastal Resources Management Council, 434 A.2d 266, 272 (R.I. 1981). However, questions of law are not binding upon a reviewing court and may be freely reviewed to determine what the law is and its applicability to the facts. Carmody, 509 A.2d at 458. The Superior Court is required to uphold the agency's findings and conclusions if they are supported by competent evidence. Rhode Island Public Telecommunications Authority, et al. v. Rhode Island Labor Relations Board, et al., 650 A.2d 479, 485 (R.I. 1994).
 Issue
Whether the Hearing Officer erred when he determined that Coutu's gross rental income is one hundred thirty five ($135.00) dollars weekly or five hundred eighty five ($585) dollars monthly. (Administrative Hearing Decision, May 18, 2001.)
 Applicable Law And Analysis
DHS is an agency within the Executive Branch of state government. R.I.G.L. 1956 § 42-12-1, et seq. In accordance with its statutory mandate, DHS is responsible for the management, supervision and control of various social service programs. It manages the state and federally funded public financial assistance programs. R.I.G.L. 1956 § 42-12-4.
General Laws § 40-8-1, et seq establishes the State of Rhode Island Medical Assistance Program. Pursuant to statutory authority, DHS administers this program and has promulgated rules and regulations to carry out the policies and purposes of the Act. R.I.G.L. 1956 §40-8-13. The regulations address the post-eligibility treatment of income. DHS Manual § 0392.05. "Institutionalized Medical Assistance recipients are required to apply their income toward the cost of institutional care." DHS Manual § 0392.05. Department of Human Services Regulations 0382.01, et seq. and 0388.01, et seq. prescribe the manner in which DHS calculates income generated from jointly owned rental property. The regulations provide as follows:
 TYPES OF OWNERSHIP OF REAL ESTATE 0382.10.10.05 REV: 06/1994
. . . If the property is not otherwise excludable [property held in Joint Tenancy or in Common with another], the applicant's proportional share of the equity value of the property is counted toward the resource limit. (Unless stated otherwise in the deed, the applicant's proportional share of ownership is the ratio of 1 to the total number of owners.)
 HOME AND ASSOCIATED LAND EXCL. 0382.10.05 REV: 06/1994 The home, defined as the principle place of residence, is excluded, regardless of value, if the institutionalized individual certifies in writing that it is his/her intention to return home. A home is any shelter in which the individual or his/her spouse has an ownership interest (e.g. title or life estate), and which is used by the individual or his/her spouse as the principal place of residence. The home may be fixed or mobile. Cooperative and condominium apartments, motor, and house boats are examples of homes. (Emphasis added.)
The Hearing Officer calculated the monthly gross rental attributable to Coutu by determining the rental value of the three apartments and then determining that Coutu would be entitled to half that value. Two of the apartments are rented. One apartment is rented for one hundred ($100.00) dollars and another is rented for eighty ($80.00) dollars. The Hearing Officer averaged the rents and found that the rental value of the three apartments is ninety ($90.00) dollars a week. (Tr. at 36.) He reasoned that since Cavaco is residing on the first floor, Cavaco is receiving the full value of that apartment. The Hearing Officer concluded that since Coutu is also entitled to the full value of one apartment, she should receive ninety ($90.00) dollars a week gross income from one of the rented apartments. The Hearing Officer split the rental income from the other apartment and attributed an additional forty-five ($45.00) dollars a week gross income to Coutu. He attributed one hundred thirty-five ($135.00) dollars weekly gross income to Coutu. He also considered all of the allowable expenses for the building and split them between the co-owners.
The Hearing Officer disregarded undisputed evidence that Coutu had vacated the first floor apartment and that her daughter moved into the apartment to share it with her mother in the event that Coutu was discharged from the nursing home. In fact, the Hearing Officer advised Cavaco that he was not interested in hearing testimony concerning which apartment Coutu actually occupied and vacated when she entered the nursing home. (Tr. at 14.) By determining that Coutu was entitled to all of the weekly gross rentals from one of the rented apartments, the Hearing Officer failed to exclude the value of the "return home unit." He likewise failed to exclude expenses incurred to maintain the "return home unit."
The agency had designated the third floor apartment as the "return home unit." Since that unit generated one hundred ($100.00) dollars weekly rent, DHS attributed that amount to Coutu. The Hearing Officer determined that all three units had the same rental value of ninety ($90.00) dollars a week and attributed all rental income generated from one of the rented units to Coutu.
Neither the agency nor the Hearing Officer considered the undisputed evidence that the first floor (ground floor) unit was not only the apartment occupied by the co-owner, Cavaco, it was also the "return home unit." Cavaco is Coutu's only child. (Tr. at 8.) Cavaco moved into her parent's apartment when she became a co-owner, after her father had died, to live with and care for her mother in the event that she was ever able to return home. She testified:
 "I live in — I took my mother's unit over in the intent that if she came home, that there's a spare room there and that apartment is on the ground floor . . . The other unit that we — we had the third floor unit, and I said if we (Cavaco and her husband) stayed up there, there's a flight of stairs to go up which my mother probably wouldn't . . ." (Tr. at 9.)
She described the apartment as having two bedrooms. She had her husband sleep in one bedroom and leave the remaining bedroom open "[i]n case my mother comes home." (Tr. at 30.)
In accordance with DHS Manual § 0382.10.05, DHS excludes the rental value of the "return home unit" from the rental income attributable to an applicant or recipient. In this case, the agency unilaterally determined that the third floor unit should be designated as Coutu's "return home unit." The agency made this determination in spite of the absence of evidence that Coutu ever resided in that apartment. The agency then concluded that since the unit had been rented to another during Coutu's absence from the property, all rent from that unit would be attributed to Coutu.
The Hearing Officer came to a similar conclusion based on somewhat different reasoning. He determined that because the co-owner, Cavaco occupied the first floor, it was no longer available to Coutu as her "return home" unit. Without expressly finding that Coutu would not be returning home, the Hearing Officer denied her the benefits of the "return home unit" exclusion contained in § 0382.10.05.
Both the agency and the Hearing Officer disregarded undisputed evidence that the first floor apartment was Coutu's principle place of residence when she entered the nursing home. They likewise disregarded the undisputed evidence that if Coutu left the nursing home, she would return to her prior first floor apartment, and not to another unit.
The record is devoid of any evidence that Coutu ever occupied any unit other than the first floor apartment. She and her husband lived on the first floor prior to 1995 when Coutu began to reside at West View Nursing Home. Coutu's husband remained in the two bedroom first floor unit until his death in 1998. (Tr. at 13, 30.) Cavaco then moved from her third floor unit into her parent's ground floor apartment for her mother's benefit. One of the two bedrooms remains open for Coutu to occupy if she returns home. (Tr. at 30.) Both the agency and the Hearing Officer erred when they calculated Coutu's income without considering that the first floor apartment was her "return home unit." The first floor apartment always has been owner occupied. Coutu resided in that apartment with her husband and co-owner. Her daughter, the successor in interest to her husband's share, occupies it presently. A bedroom is available for Coutu if she is able to return home.
By failing to consider the applicability of the DHS Manual § 0382.10.05, the Hearing Officer misconceived the evidence. DHS Manual § 0382.10.05 requires DHS to exclude the apartment vacated by the recipient when she entered the nursing home. It does not allow DHS to choose another unit and unilaterally determine that the recipient will occupy it if she returns home in spite of the fact that it was never her principal place of residence. The undisputed evidence reveals that Coutu would return to her former unit and share the apartment with her daughter if she returned home. (Tr. at 9, 30.)
If the first floor apartment is owner-occupied by Coutu's daughter and co-owner, Cavaco, and if it is excluded from rental income as the "return home unit", then the income generated from the second and third floor rental units should be split between the two co-owners equally. The manner in which the Hearing Officer split the rental income between Coutu and Cavaco was clearly erroneous in view of the reliable, probative and substantial evidence on the whole record and was arbitrary and capricious and characterized by abuse of discretion or clearly unwarranted exercise of discretion.
 Conclusion
For the foregoing reasons, Plaintiff's appeal is sustained. This case is remanded to the Hearing Officer to re-calculate the income attributable to Coutu as follows:
Coutu's former home, the first floor unit shall be designated the "return unit"; and the co-owners, Cavaco and Coutu shall share the rental income for the second and third floors equally. Likewise, the expenses for the second and third floor apartments only should be split between the co-owners for purposes of calculating Coutu's gross income and allowable deductions.
Counsel shall present an order consistent with this decision.